## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------

SETH GERSZBERG and EGRHC, LLC,

               Plaintiffs,

      vs.

ICONIX BRAND GROUP, INC.,
IP HOLDINGS UNLTD., LLC, and
NEIL COLE,

           Defendants.

-------------------------------------------------------------------

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs, Seth Gerszberg ("Gerszberg") and EGRHC, LLC ("EGRHC") (together "Plaintiffs"), by and through their undersigned attorneys, as and for their Complaint allege the following against Defendants Iconix Brand Group, Inc. ("Iconix"), IP Holdings Unltd., LLC ("IPHU"), and Neil Cole ("Cole") (collectively, "Defendants") as follows:

### INTRODUCTION

1.     Plaintiffs are the successors in interest to Suchman, LLC ("Suchman"), a company owned by Gerszberg which had served as the principal unsecured lender to a group of affiliated companies comprising Marc Ecko Enterprises ("MEE"), the original owners of the ECKO UNLTD.®, MARC ECKO®, ZOO YORK® and other valuable trademarks (the "MEE Brands") licensed globally for use in apparel and other consumer products.  Plaintiffs bring this action seeking more than $100 Million in damages to redress a pattern and practice of bad-faith, intentional, and fraudulent misconduct by which the Defendants knowingly and intentionally destroyed the value of the critically important MEE Brands licensing business that the Defendants were responsible for managing.  Defendants intentionally drove MEE into financial

ruin and bankruptcy, causing Suchman to lose more than $26 million in unrecouped loans as well as the value of its interest in the MEE Brands business, among other damage.

2.     The Defendants are an individual named Neil Cole and two companies he controlled – Iconix, a publicly-traded brand management company (stock symbol ICON) that Cole founded and ran until August 2015 (when he was forced to resign in the midst of securities fraud allegations), and IPHU, a joint venture between Iconix (holding 51%) and Suchman (holding 49%) that was created in 2009 to serve as licensor of the MEE Brands.  Defendants were charged with managing, supporting, and promoting the MEE Brands business (IPHU), the most important and valuable asset of which was a global MEE License Agreement under which a Gerszberg affiliate, 3TAC, LLC ("3TAC" or "Master Licensee"), served as the master exclusive licensee for the MEE Brands.

3.     Instead, however, Cole developed a personal animosity and vendetta toward Gerszberg, his IPHU business partner, and successfully orchestrated a malicious campaign to ruin Gerszberg and his affiliated entities, including Master Licensee and its affiliated sublicensees (the MEE operating companies) and Suchman (the minority member of IPHU and principal lender to the MEE operating companies).

4.     Iconix and Cole, breaching their fiduciary duties and abusing their positions as majority member and manager of IPHU, engaged in a multi-year campaign of bad-faith and intentionally harmful actions designed to diminish and destroy the value and profitability of the MEE licensing business – once worth $20 million a year.  Defendants knew and intended that their sabotaging actions would reduce sales revenues, reduce distributions to Suchman, and prevent Master Licensee from meeting its minimum royalty payment obligations to IPHU, thereby causing Suchman to make unsecured loans to the MEE operating companies (which they

would be unable to repay) and enabling Defendants to declare Master Licensee in default and subject to termination, which would create further financial distress which Defendants could (and did) exploit to their own benefit by forcing a buyout of Suchman's interest in IPHU at an unfairly devalued price.  Put more simply, Defendants orchestrated a "cram-down" or "squeeze-out" through a variety of wrongful acts targeted against the MEE companies as a means of causing damage to Suchman.

5.     Unfortunately for Gerszberg and his businesses, Defendants' multi-year sabotage of the MEE Brands licensing business was effective.  In May 2013, exploiting the situation of economic duress that they had created for Suchman and the MEE companies, Defendants fraudulently implemented their bad-faith "cram-down" strategy by which Iconix bought out Suchman's 49% membership interest in IPHU at a grossly devalued price and simultaneously imposed an amendment of the global MEE License Agreement that required Master Licensee to pay excessive past and advance royalties for reduced, non-exclusive license rights going forward. Also as part of the buyout transaction, Defendants promised Suchman certain "perpetual royalty stream" rights, which Defendants never intended to honor and to date never have honored.

6.     Defendants fraudulently induced Gerszberg and his businesses to enter into these transactions through affirmative misrepresentations and concealment of material information that they had a duty to disclose.  Defendants misled Gerszberg to believe that their proposed buyout transaction and MEE License Agreement modification were predicated on a reasonable valuation of the MEE Brands business based on a new business model with a replacement master licensee and new distribution channels that Defendants said they were planning, in the exercise of their business judgment and brand management expertise, in the best interests of the MEE Brands business.  On that basis, Suchman and Master Licensee agreed to enter into the transactions, with

economic terms based on the future royalty revenues Defendants projected to flow from their modified MEE licensing business.

7.      Only later did it become apparent that Defendants' representations about their modified business plans (which induced Suchman, Gerszberg and MEE to enter into transactions in May 2013) were false when made and their revenue projections had no reasonable basis in fact, but were merely a phony construct designed to induce Suchman and its affiliates to agree to the squeeze-out transactions that deprived them of their tens of millions of dollars of prior investment and the true value of the MEE Brands business.

8.      Moreover, then unbeknownst to Gerszberg and his companies, on information and belief, Defendants designed the May 2013 transactions in a manner which permitted Defendants to further a fraudulent accounting scheme perpetrated by Iconix and Cole.  Iconix sought to acquire 100% ownership of IPHU so that it could use IPHU as an instrument in a fraudulent "round tripping" technique by which $20 million of the supposed purchase price payable by Iconix for Suchman's 49% interest would actually be used to pay the excessive and disputed royalty payments that IPHU demanded from Master Licensee.  Thus, upon information and belief, as Gerszberg only later came to realize, the entire 2013 negotiation was a sham, based not on any of Defendants' genuine, good-faith judgments about business plans or projections but rather on Defendants' illicit desire to implement this round-tripping transaction to inflate Iconix's publicly-reported earnings.  Defendants were thereby simultaneously defrauding both Gerszberg and Iconix's shareholders.  As set forth below, this transaction was just one of multiple other instances of "round-tripping" perpetrated by Iconix and Cole to artificially inflate and overstate Iconix's earnings over time.

9.      Even after Defendants fraudulently obtained 100% ownership of IPHU, they

continued their campaign of intentionally injurious, bad-faith actions against Master Licensee and the MEE operating companies; *see, e.g.*, co-pending litigation *3TAC, LLC v. Iconix Brand Group, Inc.*, No. 1:16-cv-08795 (LTS) (JCF) (the "3TAC Litigation") in which 3TAC and its sublicensee West Loop South, LLC assert breach of contract and tortious interference claims arising from Defendants' having made materially false representations to customers of 3TAC and West Loop South, LLC which deprived such plaintiffs of the benefits of the MEE License Agreement following the May 2013 transaction.[1]  Defendants' malicious objectives were ultimately achieved in April 2014, when the MEE operating companies, having suffered years of sabotage by Defendants, were finally forced into bankruptcy.  Suchman, as lender to the MEE companies, lost more than $26 million when its unsecured debt position was discharged in the MEE bankruptcy case.

10.     Accordingly, Gerszberg and EGRHC, as successors-in-interest to Suchman's rights, assert claims for breach of fiduciary duty, fraudulent inducement, breach of contract, and unjust enrichment.  Plaintiffs seek reformation or voiding of certain provisions of the 2013 buyout transaction; an accounting of the revenues, disbursements, and transactions of IPHU; restitution of amounts by which Defendants were unjustly enriched; and compensatory and punitive damages in excess of $100 million.

---

[1] For avoidance of doubt, the claims asserted by 3TAC and West Loop South, LLC in the 3TAC Litigation do not overlap with the claims asserted by Plaintiffs in this litigation, including without limitation because the two actions are predicated on different plaintiffs asserting different claims for their different respective harms.

## PARTIES

11.     Plaintiff Seth Gerszberg is an individual residing at 229 Chestnut Street, Englewood, NJ 07631.  At all relevant times, Gerszberg was the sole owner of Suchman, a limited liability company formed under the laws of the State of New Jersey.

12.     By assignment of rights dated May 30, 2014, Gerszberg is the successor-in-interest to all causes of action that Suchman at any time had against Defendants, including with respect to causes of action asserted herein.

13.     EGRHC is a limited liability company formed under the laws of the State of New Jersey.  EGRHC is wholly owned by Gerszberg.  As such, EGRHC is a citizen of New Jersey.

14.     EGRHC is the successor-in-interest to all of Suchman's rights in and relating to the "perpetual royalty stream" provided for in the Membership Interest Purchase Agreement dated as of May 17, 2013 (the "Buyout Agreement") and associated claims against Defendants.  Such rights were assigned to EGRHC in 2013, as permitted by the Buyout Agreement.

15.     Iconix is a publicly-held corporation incorporated under the laws of the State of Delaware, with its principal place of business at 1450 Broadway, New York, NY 10018.  As such, Iconix is a citizen of each of Delaware and New York.  Iconix is a public company registered on the NASDAQ exchange under the stock symbol "ICON".

16.     On its website (www.IconixBrand.com), Iconix holds itself out as "the world's premier brand management company and owner of a diversified portfolio of strong global consumer brands across fashion, sports, entertainment and home."  The website states that Iconix "specializes in marketing, merchandising and licensing its brand portfolio and has over 1,100 licenses with leading retailers and manufacturers worldwide that sell across various distribution channels from the mass tier to the luxury market, as well as through various media outlets."

17.     IPHU is a limited liability company formed under the laws of the State of Delaware, with its principal place of business at 1450 Broadway, New York, NY 10018.  From October 26, 2009 to May 17, 2013, IPHU was owned 51% by Iconix and 49% by Suchman. Iconix secured 100% ownership of IPHU in the buyout transaction at issue herein.

18.     Upon information and belief, IPHU has been a wholly-owned subsidiary of Iconix since May 17, 2013.  By virtue of the citizenship of its sole member, IPHU is a citizen of each of Delaware and New York.

19.     Defendant Neil Cole is an individual who, upon information and belief, resides in Manhattan, New York and had a last known business address of c/o Iconix at 1450 Broadway, New York, NY 10018.  Upon information and belief, Cole is a citizen of New York.

20.     Cole was the Chief Executive Officer, President and Chairman of the Board of Iconix at all relevant times until he resigned in or about August 2015.  Cole was also a Manager of IPHU designated by Iconix, the majority owner and controlling Administrative Member of IPHU.  In these capacities, Cole controlled both Iconix and IPHU at all relevant times.

**JURISDICTION AND VENUE**

21.     Jurisdiction over this matter is based upon 28 U.S.C. § 1332(a)(2), as the claims made herein exceed the sum of $75,000, exclusive of interest and costs, and are between citizens of different States.  Each of the Plaintiffs is a citizen of New Jersey, and each of the Defendants is a citizen of New York and/or Delaware.

22.     Venue in this Court is proper under 28 U.S.C. § 1391, including because this is the judicial district in which Defendants reside.

23.     Venue is also proper pursuant to § 9.11 of the Buyout Agreement, which provides that each party "irrevocably and unconditionally consents to submit to the jurisdiction of the

courts … of the United States located in County of New York in the State of New York for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby" and "waives any objection to the laying of venue of any such litigation in such courts."

## FACTUAL ALLEGATIONS

### A. Marc Ecko Enterprises

24.     Gerszberg is one of the founding members of "MEE", a group of affiliated companies that were all ultimately owned or controlled by or otherwise affiliated with Gerszberg.

25.     MEE had a relatively complex corporate structure reflecting its diverse global operations.  In 2009, MEE included (a) a number of intellectual property holding companies which, among other things, owned global intellectual property rights in and to the MEE Brands (ECKO UNLTD.®, MARC ECKO® and ZOO YORK® brands), and (b) a number of operating companies that operated global apparel and other businesses using the MEE Brands under licenses from the intellectual property holding companies.

26.     Different MEE companies (a) operated wholesale businesses under the ECKO UNLTD.® and/or MARC ECKO® brands (together, the "Ecko Brands"); (b) operated wholesale businesses under the ZOO YORK® brand (the "Zoo York Brand"); (c) operated brick-and-mortar retail businesses for the MEE Brands, including through a chain of more than 100 retail stores; and (d) operated e-commerce businesses for the MEE Brands.  Some of the MEE operating companies operated within the United States, while others operated in various other countries throughout the world.

27.     MEE had successfully monetized the MEE Brands through direct wholesale and retail operations in the casual apparel field, and also by granting third-party licenses that

generated sales across multiple product categories (*e.g.*, footwear, skateboards, watches) and geographic territories (*e.g.*, Canada, Asia, Europe, South America). As of October 26, 2009, the MEE Brands were hugely successful global brands, having generated more than $1 billion in annual retail sales.

### B. Gerszberg's and MEE's Entry into a Joint Venture with Iconix and Cole

28. In October 2009, in need of capital and seeking to strengthen the MEE Brands business, Gerszberg agreed to enter into a business partnership with Iconix, a global brand management company that had been founded by Cole in 1993. Gerszberg chose to work with Iconix and Cole because they purported to have special expertise and successful experiences in managing consumer branded products businesses on a global level.

29. Iconix held itself out in a 2009 Prospectus as

> "a brand management company engaged in licensing, marketing and providing trend direction for our portfolio of owned consumer brands. … Our brands are sold across a variety of distribution channels, from the mass tier to the luxury market. We support our brands with innovative advertising and promotional campaigns designed to increase brand awareness, and provide our licensees with coordinated trend direction to enhance product appeal and help maintain and build brand integrity. … We believe we have an innovative business model. … We believe our business model allows us to grow faster and generate higher margins with lower operating risk than under a traditional operator business model."

30. Cole had purported to build up Iconix by aggressively acquiring a diverse portfolio of trademarks and marketing them through a global infrastructure of wholesale and retail channels. In 2009, according to its Prospectus, Iconix owned 17 successful apparel and other brands including Candie's, Bongo, Joe Boxer, Mudd, London Fog, Ocean Pacific, Rocawear, Cannon and Starter.

31. As a "brand management company," Iconix generally does not conduct operations in the form of manufacture and distribution activities, but rather "manages" brands through

administration of licensing programs.  Iconix typically acquires ownership of the brands and then licenses its brands to operating companies which in turn design, manufacture, sell and distribute products subject to contractual obligations to make royalty payments to Iconix.

32.     Thus, Iconix's revenue stream is primarily a function of royalty payments received from its various licensees.  The royalty payments due to Iconix are typically calculated as a percentage of actual sales by the licensees coupled with pre-negotiated guaranteed minimum royalty commitments (payable regardless of actual sales).

33.     Cole effectively controlled Iconix and its subsidiaries at all relevant times herein. Cole was the Chief Executive Officer, President and Chairman of the Board of Iconix from 1993 (when the company was known as Candie's) until the date he resigned from Iconix in or about August 2015 amid allegations of accounting irregularities and securities fraud.

34.     Aside from their vaunted expertise in managing brands and providing "trend direction" and innovative advertising support to their licensees, unbeknownst to Gerszberg, Cole and Iconix also had experience with formulating and implementing fraudulent accounting practices and irregular transaction structures to manipulate royalty flows and artificially inflate Iconix's publicly-disclosed earnings.  As set forth below, Cole and Candie's paid more than $10 million to settle charges of accounting fraud in 2000-2003; the SEC began inquiring into certain of Iconix's accounting practices in 2013; and recent Iconix stockholder suits allege that Cole and Iconix committed a series of accounting violations that resulted in inflated earnings reports, and greater performance-based compensation to Cole from 2012 to 2015.

### C.  The October 26, 2009 Joint Venture and License-Back Transaction

35.     Although ordinarily Iconix (or a subsidiary) would acquire full ownership of the brands it managed, for the MEE Brands Cole and Gerszberg instead agreed to a joint ownership

structure: Gerszberg's MEE companies would sell their rights in and to the MEE Brands to a newly-created company, IPHU, in which Iconix would hold the controlling interest and Gerszberg's company, Suchman, would hold the minority interest.

36.     Thus, on October 26, 2009, Gerszberg and his MEE affiliated entities (including Suchman, the MEE intellectual property holding companies and the MEE operating companies), on the one hand, and Iconix and Cole, on the other hand, entered into a transaction (the "2009 Transaction") by which, among other things, (i) IPHU was formed to take ownership of and serve as a "brand management company" for the MEE Brands, and (ii) in a "license-back" arrangement, IPHU granted a new license pursuant to which MEE (and/or any other Gerszberg-affiliated entities) would continue to operate wholesale, brick-and-mortar retail, and e-commerce businesses for the MEE Brands throughout the United States and most of the world.

37.     The material terms of the 2009 Transaction, as provided in IPHU's Operating Agreement (the "IPHU Operating Agreement") and other transaction documents, included the following:

(a)     Iconix held 51% of the membership interests and Suchman (owned 100% by Gerszberg) held 49% of the membership interests in IPHU;

(b)     IPHU acquired global ownership of the MEE Brands from the MEE intellectual property holding companies, and also acquired all then-existing license agreements and future licensing rights for the MEE Brands, including the right to receive all royalty streams in connection therewith;

(c)     IPHU's profits were to be distributed between its members (Iconix and Suchman) subject to a sliding-scale formula that provided for Suchman's percentage of profits to rise or fall together with the rise or fall of total royalties collected by IPHU, such that Suchman's

percentage rate would range from 42.5% for lower total royalty collections by IPHU, up to 53.8% for higher total royalty collections by IPHU;

   (d) Iconix was designated as the "Administrative Member" of IPHU, which meant that Iconix controlled the accounting, finance, legal and other back-office services for IPHU, including the collection of royalties and associated audit and other enforcement efforts against IPHU's licensees (which included Gerszberg-affiliated licensees and licensees unaffiliated with Gerszberg); and

   (e) IPHU assumed $90,000,000 of debt payable to LF Centennial Limited ("Li & Fung"), at 7.5% annual interest, with outstanding principal under the note (the "Li & Fung Note") subject to repayment at the rate of $2,500,000 per calendar quarter from January 2010 through June 2014, and the remaining $45,000,000 principal to be repaid on June 30, 2014.

  38. To effectuate the license-back arrangement, IPHU, as Licensor of the MEE Brands, simultaneously entered into a new master Global License Agreement dated as of October 30, 2009 (the "MEE License Agreement") with a new Gerszberg-affiliated entity called 3TAC.

  39. To avoid the need for IPHU to enter into multiple licenses with the numerous existing and anticipated future licensees of the MEE Brands, and to satisfy Iconix's desire to streamline the administrative mechanics of royalty payment and reporting processes, the parties agreed to structure the licensing program with a single intermediary master licensee (3TAC) that would in turn enter into sublicenses with various existing and anticipated operating entities comprising MEE.

  40. Accordingly, (a) 3TAC was formed to serve as an intermediary pass-through licensee entity which would have no actual sales operations; and (b) IPHU granted to 3TAC the exclusive rights to use (and sublicense the use of) the MEE Brands in connection with the

design, manufacture, distribution, sale and promotion of apparel and other products throughout

the United States and dozens of other specified countries throughout the world.  The MEE

License Agreement contemplated that the licensed rights would be sublicensed to a pre-approved

class of sublicensees consisting of all entities then or thereafter affiliated with Gerszberg.

41.     This pass-through licensing structure was intended to allow all of Gerszberg's

entities to receive the functional equivalent of direct licenses from IPHU while reducing

administrative complexities for IPHU (*i.e.*, for Iconix as Administrative Member of IPHU).

Under this structure, (a) various licensing terms (such as minimum royalty commitments and

renewal thresholds) could be papered by reference to a single licensee (3TAC), but applicable

across all of Gerszberg's numerous operating entities, and (b) IPHU would receive singular

royalty payments and reports from one Licensee (with consolidated data from all affiliated

sublicensees) rather than multiple payments and reports.

42.     All of the rights 3TAC received under the MEE License Agreement were

simultaneously sublicensed to 3TAC's affiliated operating entities (all indirectly owned by

Gerszberg), including MEE Apparel, LLC ("MEE Apparel"), MEE Direct, LLC ("MEE Direct")

and several MEE international entities.  In accordance with the terms of the MEE License

Agreement, 3TAC also later executed additional sublicenses with affiliated entities that were

formed later.

43.     Under the MEE License Agreement, 3TAC was contractually obligated to pay

royalties to IPHU, with such royalty payments calculated as a percentage of actual sales made by

3TAC's affiliated sublicensees and further subject to guaranteed minimum royalty commitments

which approximated $20,000,000 per year.  As an administrative intermediary without sale

operations, 3TAC's royalty and other payment obligations were funded by and dependent upon

3TAC's contemporaneous receipts of equal amounts from its affiliated sublicensees.

**D.  <u>The Critical Importance of the MEE License Agreement and Skechers License</u>**

44.     Following the 2009 transaction, IPHU was party to dozens of license agreements from which it received royalties and other revenues from the licensing of the MEE Brands for multiple categories of goods and services in various territories worldwide.  Of all such license agreements, the MEE License Agreement (encompassing both wholesale and retail sales of the core category of apparel in the core territories of the United States and Europe) was far and away the most valuable and the most important to IPHU's business.

45.     For example, in calendar year 2010, sales by MEE under the MEE License Agreement approximated $280 million, compared to sales of only $86 million by all of IPHU's other licensees combined; and royalties payable by 3TAC to IPHU under the MEE License Agreement approximated $15 million, constituting nearly one-half of royalties payable by all of IPHU's licensees combined.

46.     In addition, MEE was responsible for marketing, brand stewardship and other operational activities not just for MEE's own activities under the MEE License Agreement, but also for the benefit of IPHU's dozens of other licensees around the world.  The success or failure of MEE's operations under the MEE License Agreement directly impacted the success or failure of IPHU's other licensees based on information, designs, materials and other branding services provided to those other licensees by MEE.  Also, the strength, value, consumer perception and demand for the MEE Brands in the United States served as the springboard for those elements on a worldwide basis.

47.     After the MEE License Agreement, IPHU's next most important licensing relationship was its license agreement with Skechers footwear company (the "Skechers

14

License").  Cole and Iconix knew that the Skechers License was important to MEE's operations and to the value of the MEE License Agreement.  Under the Skechers License, IPHU granted Skechers the exclusive right to use the Ecko Brands on and in connection with design, distribution, sale and promotion of footwear throughout the United States and many other countries in exchange for (a) Skechers paying IPHU a royalty equal to 7% of Skechers' net sales of such licensed products, and (b) Skechers undertaking marketing activities for the Ecko Brands by way of direct marketing spends in amounts totaling no less than 3% of Skechers' net sales of such licensed products (the "Skechers Marketing Spend").  Skechers consistently invested in marketing the Ecko Brands far beyond that required by the Skechers Marketing Spend, and its marketing efforts materially bolstered demand for Ecko-branded products, including by driving apparel sales under the MEE License Agreement.

### E.  The Interrelated Economics Between Suchman and MEE

48.     The 2009 Transaction created a structure by which the business, legal and economic relationships between Suchman and Iconix (as members of IPHU) and IPHU and MEE (as parties and intended beneficiaries under the MEE License Agreement) were interrelated and interdependent.  Specifically, (a) IPHU received revenues from payments by its licensees, including payments from the several MEE companies passed through 3TAC; (b) Suchman received distributions by IPHU to its members; and (c) Suchman used its distributions to fund MEE's operations and associated cash flow needs, including 3TAC's royalty payments to IPHU under the MEE License Agreement.

49.     Thus, the 2009 Transaction was predicated upon an agreement by and among Iconix, IPHU, Suchman and MEE that MEE (including 3TAC) would fund their royalty obligations to IPHU under the MEE License Agreement by use of funds distributed to Suchman

by IPHU at the ownership level.  Iconix and Cole, the Administrative Member and Manager of IPHU, respectively, knew that MEE's ability to pay the royalty obligations was necessarily dependent upon Suchman receiving full and timely distribution payments (or credits) from IPHU.

50.    To support the business relationship established in the 2009 Transaction, Suchman loaned tens of millions of dollars to MEE to support MEE's operations and expenses in connection with the MEE License Agreement.  From October 26, 2009 (the date of the 2009 Transaction) through May 17, 2013 (the end of the IPHU joint-venture relationship), Suchman made unsecured loans in the amount of $26,578,265 to MEE Apparel to support MEE's operations under the MEE License Agreement (the "Suchman-MEE Loan").

51.    Insofar as MEE's sole business operations arose under the MEE License Agreement, the only way MEE could repay the Suchman-MEE Loan was from profits generated by MEE through its activities under the MEE License Agreement.  Accordingly, Suchman extended the Suchman-MEE Loan in reliance upon its reasonable expectation that Iconix and Cole would act in good faith, in compliance with the letter and spirit of the IPHU Operating Agreement and in a manner consistent with their fiduciary duties owed to IPHU and Suchman, with respect to the administration and operation of IPHU's business, including in particular its relationships with 3TAC and MEE under the MEE License Agreement.

52.    In consideration of Suchman's huge investment, and to enable Suchman to recoup the benefits of its investment through MEE's performance over an extended period, the MEE License Agreement provided that MEE's exclusive license and sublicense rights extended for an initial term of 4½ years (*i.e.*, through June 30, 2014), with renewal options totaling an additional 16 years (*i.e.*, through June 30, 2030).

53.     The 2009 Transaction also included a mechanism (the "Recombination Right") by which Suchman and MEE together could implement a combined exit strategy that would maximize the value of Suchman's indirect ownership rights by recombining the bifurcated intellectual property and operating divisions of the MEE Brands business.  The Recombination Right was designed to enable Suchman to sell the entirety of IPHU by requiring Iconix to sell its majority membership interest as part of a sale that also encompassed sale of the MEE License Agreement.

### F.   Defendants' Multi-Year Campaign to Destroy Gerszberg, MEE and Suchman

54.     Cole, who was arrogant and dictatorial, did not want to share ownership or control of IPHU with Gerszberg.  Cole viewed Gerszberg as an adversary to be defeated rather than a joint venture partner.  Cole developed a personal hatred of Gerszberg and undertook a malicious campaign, implemented through the two entities he controlled, Iconix and IPHU, to drive Gerszberg and his businesses into financial ruin and bankruptcy.  Upon information and belief, Iconix and Cole also believed that they could materially benefit from the destruction of Gerszberg and Suchman because, if and when Iconix could secure complete ownership of IPHU, it would be positioned to engage in "round-tripping" to artificially inflate its publicly disclosed earnings, as Iconix and Cole had done with respect to other of Iconix's wholly-owned brands.

55.     Cole, Iconix and IPHU individually and collectively committed a series of intentionally injurious and subversive acts intended to sabotage and impair MEE's rights and profitability under the MEE Licensee Agreement, and thereby to devalue Suchman's membership interest in IPHU.  These acts were in breach of Iconix's and Cole's fiduciary duties to Suchman and IPHU, and in breach of the express provisions and the implied covenant of good faith and fair dealing in each of the MEE License Agreement and the IPHU Operating

Agreement, as they were undertaken in bad faith to impair IPHU's MEE licensing business and thereby devalue Suchman's interest in IPHU and to deprive MEE and Suchman of the fruits of the MEE License Agreement and the IPHU Operating Agreement.

56.     Defendants knew and intended that their campaign to impair and destroy the value of the MEE License Agreement would (a) financially cripple Gerszberg and all of his businesses; (b) prevent 3TAC from meeting its royalty obligations, thereby creating a default that could be used as an excuse to terminate the License Agreement prematurely and/or extract greater concessions; (c) cause Suchman to invest more and more of its own funds, as well as expensive financing from third-party lenders, into the MEE businesses; (d) force Suchman to sell its interest in IPHU to Iconix at a devalued price (as occurred in May 2013); and (e) force the MEE operating companies into bankruptcy (as occurred in April 2014), causing a total loss of Suchman's tens of millions of dollars of invested funds.

57.     Thus, during the course of the IPHU joint venture (and extending through at least May 2013), the Defendants, individually and in combination (as each corporate defendant was controlled by Cole), committed the following wrongful actions, in bad faith, with the purpose and effect of devaluing the Ecko Brands, devaluing Suchman's interest in IPHU, putting Suchman into a liquidity crisis, and destroying Gerszberg's MEE businesses (including 3TAC and its affiliated sublicensees), all as part of a bad-faith cram-down strategy and otherwise for bad faith and malicious purposes:

a.     Defendants abused and exploited Iconix's status as Administrative Member of IPHU by wrongfully using their legal and financial departments as instruments to implement wrongful, commercially unreasonable strategies that harmed and disadvantaged 3TAC and the MEE businesses and thereby devalued Suchman's interest in IPHU.

b.      Defendants employed aggressive, wrongful, commercially unreasonable and discriminatory collection and enforcement efforts against 3TAC, IPHU's most important licensee – tactics they did not employ against any other licensee of IPHU – in a bad-faith effort to create a justification for premature termination of the MEE License Agreement and/or leverage to impose additional onerous terms on 3TAC and the MEE sublicensees.

c.      Defendants intentionally failed and refused to collect royalties owed by IPHU's non-Gerszberg-affiliated licensees, and failed to take reasonable enforcement steps against those licensees when they defaulted (in contrast to Defendants' immediate and aggressive enforcement efforts against 3TAC), which reduced the royalty revenues flowing to IPHU from which Suchman otherwise would have received distributions – which Defendants knew Suchman needed to fund MEE's operations, including 3TAC's royalty obligations to IPHU under the MEE License Agreement.

d.      Defendants knowingly and intentionally sought to reduce MEE's sales and the royalties collected by IPHU – in breach of their fiduciary duties to IPHU and Suchman, and in breach of the covenant of good faith and fair dealing implied in the IPHU Operating Agreement – so that the percentage of profits payable by IPHU to Suchman would be decreased, pursuant to the sliding-scale formula under which Suchman's percentage of profits would fall as low as 42.5% if total royalties collected by IPHU were at lower amounts, even though Suchman's ownership percentage was 49%.

e.      With respect to a sale of the ZOO YORK trademark and transfer of the Zoo York licenses from IPHU to an Iconix subsidiary on July 27, 2011, although the sale agreement called for 49% of the sales and royalties for the period up to the sale date to be paid to Suchman, Iconix and Cole intentionally failed and refused to collect royalties and marketing fees

19

owed by Zoo York licensees and refused to provide required reports of its collections from those

licensees; and IPHU and Cole intentionally failed and refused to demand such reports or audits

of Iconix's records, thereby depriving Suchman of both the revenues to which it was entitled and

the information it needed to know how much it was owed under the Zoo York sale agreement.

       f.     Defendants intentionally impaired and sabotaged the MEE Brands

marketing program (which was managed by MEE for the benefit of all licensees), creating a poor

market image and a negative dynamic by which MEE's sales were reduced, thereby adversely

impacting the percentages and total amounts of Suchman's distributions from IPHU under the

sliding-scale formula.

       g.     Although Skechers was doing an excellent job in its marketing activities

for the Ecko Brands, investing far more than the required 3% Skechers Marketing Spend, and its

marketing efforts materially bolstered demand for all Ecko-branded products, Defendants (over

Gerszberg's objection) terminated Skechers' marketing activities and had IPHU assume such

marketing obligations; but Defendants thereafter intentionally failed and refused to perform any

such IPHU marketing obligation, which diminished demand for Ecko-branded products in all

channels, and thereby caused millions of dollars of damage in lost sales in MEE's wholesale and

retail businesses, reduced royalties payable to IPHU from all licensees, reduced distributions to

Suchman, and made 3TAC unable to pay its minimum guaranteed royalty payments under the

MEE License Agreement.

       h.     Defendants' intentional mishandling and dismantling of the successful

Skechers license was so atrocious that Skechers, which had previously done up to $100 million

in revenues per year, chose to terminate its license entirely, which resulted in millions of dollars

of damage to IPHU in lost royalty revenues from Skechers, as well as the loss of the value of the

Skechers Marketing Spend and the surplus marketing investments Skechers had been

contributing (which benefitted all Ecko Brands licensees), thereby further reducing distributions

to Suchman (in both percentage and total amount), and further impairing 3TAC's ability to pay

its minimum guaranteed royalty payments.

       i.      Defendants wrongfully repudiated IPHU's obligation to reimburse

marketing monies expended by MEE in connection with the Ecko Brands, and repeatedly failed

to remit marketing sums due to MEE in timely fashion, thereby destroying MEE's marketing

programs and, by preventing MEE from using such reimbursable sums to fund MEE's operations

(including royalty obligations under the MEE License Agreement), forcing Suchman to loan or

invest more funds to support MEE's operations, all for purposes of impairing the value of the

MEE License Agreement and increasing the costs to Suchman as part of a bad-faith cram-down

strategy.

       j.      Defendants repeatedly failed and refused, in bad faith, to provide

approvals for essential MEE brand marketing initiatives and to fund marketing programs in

accordance with IPHU's agreed-upon budgets and contractual commitments, which made it

impossible for MEE to implement any reasonable marketing strategy and further diminished the

Ecko Brands market image, causing millions of dollars of damage to the Ecko Brands, loss of

sales under the MEE License Agreement, loss of royalties from all Ecko Brands licensees, and

consequently reduced distributions to Suchman (in both percentage and total amount).

       k.      Defendants wrongfully refused to refinance the Li & Fung Note only

because they knew that doing so would cause more harm to Gerszberg, Suchman and MEE than

it would to IPHU because, for so long as such note was outstanding, MEE had an incremental

payment obligation to Li & Fung which Defendants desired to keep in effect for purposes of

inflicting financial pain upon Gerszberg and his businesses, as a means of putting 3TAC in default of the MEE License Agreement in order to allow Iconix to secure full ownership of IPHU.

l.          Defendants unilaterally caused IPHU to enter into a commercially unreasonable settlement of a material litigation with Skechers, without Suchman's consent and over Suchman's objection, for inadequate consideration and in a manner Defendants knew would adversely and disproportionately affect Suchman and MEE by depriving MEE of leverage in its separate suit against Skechers and depriving Suchman of distributions which otherwise would have been used to fund MEE's operations and royalty payments due under the MEE License Agreement.

m.          Defendants concealed material conflicts of interest arising from Iconix's management of other brands that competed with the MEE Brands, for example in unilaterally negotiating and entering into deals or settlements with certain licensees (such as Kids Headquarters and Skechers) that sold merchandise under multiple brands under license from Iconix whereby more of the funds paid by the licensee would be artificially allocated to the brands that Iconix owned 100% and less to the MEE Brands, and other instances of favoring the Iconix wholly-owned brands (and thereby Iconix itself) over the MEE Brands, all without disclosure of such terms to Suchman, and with the intention and effect of impairing distributions to Suchman so as to cause harm to 3TAC and MEE under the MEE License Agreement.

n.          Defendants knowingly designed and implemented flawed and deceptive accounting methodologies in a manner out of accordance with GAAP, such as inconsistent treatment of revenues under cash versus accrual bases, all for the purposes of starving Suchman of funds which otherwise would have been used to fund 3TAC's obligations under the MEE

License Agreement.

    o.    Defendants wrongfully scheduled and conducted meetings with existing and potential MEE Brands retailers without notice, invitation or information-sharing with Suchman, in breach of the IPHU Operating Agreement, including meetings in which Iconix personnel made poorly-constructed marketing presentations to retailers (such as JC Penney, Target and Walmart) that were not well-received, thereby impairing the value of the MEE Brands and causing substantial prejudice to the Ecko Brands generally and to MEE's rights under the MEE License Agreement.

    p.    Defendants failed and refused to make a downward adjustment to royalties owed by MEE to IPHU, as the MEE License Agreement required, to account for a *force majeure* event (Hurricane Sandy) that had material adverse impact upon the warehousing, retail and other operations of MEE, thereby knowingly and intentionally pushing 3TAC and MEE into default and increasing Suchman's funding obligations.

    q.    Defendants' bad-faith acts targeted against the MEE License Agreement had direct and proximate cascading impact which caused major harm to the Ecko Brands as a whole, thereby adversely impacting the businesses (and royalty payments) of several other (if not all other) licensees of IPHU.

    r.    Defendants repeatedly and wrongfully threatened to terminate the MEE License Agreement, supposedly due to 3TAC's failure to make the minimum guaranteed royalty payments, despite the fact that it was Defendants themselves, through their intentional misconduct described above, who caused the impairment of the MEE Brands business which led to multi-million-dollar decreases in royalty revenues from all Ecko Brands licensees and in turn reduced distributions to Suchman that would otherwise have been used to fund 3TAC's royalty

obligations.

s.      As set forth in greater detail below, in May 2013 Defendants wrongfully terminated the exclusive MEE License Agreement as part of a bad-faith cramdown strategy implemented in order to secure full ownership of IPHU (evidenced among other things by the fact that termination of the MEE License Agreement was combined with a wrongful threat and demand that Suchman immediately sell to Iconix all of Suchman's ownership interest in IPHU or otherwise face immediate bankruptcy), and did so without having any *bona fide* successor licensee in place to replace MEE, which damaged the value of the Ecko Brands, damaged the value of IPHU, deprived Suchman of its multi-million-dollar Recombination Right and had other material adverse impact upon Suchman.

58.      As a direct and proximate result of these and other wrongful acts targeting the MEE License Agreement, Defendants intentionally and effectively destroyed the value of the Ecko Brands and the combined enterprise value of IPHU.  Defendants did so for the purpose of causing harm and financial ruin to Gerszberg and Gerszberg's companies, motivated by Cole's personal animus toward Gerszberg and a bad-faith intent to force Suchman to sell its shares of IPHU to Iconix.

59.      On information and belief, Cole, who was the CEO, President, and Chairman of Iconix (which was the controlling member of IPHU), actively directed and participated in all of the foregoing malicious, abusive actions and decisions against Gerszberg, MEE and Suchman and their affiliates.  Cole caused the entities he controlled to engage in this misconduct as part of his personal animus against, and desire to destroy, Gerszberg and his affiliated companies involved in ownership or operation of the Ecko Brands.

60.      Defendants' efforts to intentionally cause harm to Gerszberg and his businesses

was no hidden secret.  Indeed, an October 18, 2015 article from the *New York Post,* titled

"Former Iconix CEO Accused of Sabotaging the Marc Ecko Brand," and available at

http://nypost.com/2015/10/18/marc-ecko-former-owner-under-fire-for-alleged-sabotage/

(accessed October 31, 2017), described a third-party lawsuit brought by Marcraft Apparel Group

(which was IPHU's licensee in the formalwear category) and corroborates that Defendants

sought to "sabotage" the MEE businesses for purposes of obtaining sole control of IPHU.  As the

article states, in relevant part:

> "An explosive lawsuit alleges that majority owner Iconix and its former chief executive sabotaged the brand — hurting its licensing partners in the process — as part of a twisted plot to wrest full control of the business from its co-founder.
>
> Former Iconix CEO Neil Cole 'deliberately failed to market, promote, protect and preserve' the Ecko brand in a successful bid to bankrupt Seth Gerszberg, the former business partner of founder Marc Ecko and the brand's biggest licensee, according to the suit.
>
> Creative differences between the two men 'set Cole on a mission to bring Gerszberg (and his companies) to financial ruin and, ultimately, bankruptcy,' the suit alleges. . . .
>
> The suit casts a harsh light on Iconix and its former CEO. The company, which owns a slew of brands including Joe Boxer, Candie's and Rocawear, is already feeling the heat from analysts who are questioning its rapid growth. Cole stepped down in August under a cloud of accounting irregularities.
>
> New York-based Marcraft claims Cole 'purposefully degraded' the brand in his dispute with Gerszberg over the direction of Ecko — but hid the damage from other licensing partners so they would re-up their deals and keep paying royalties. . . .
>
> Cole refused to work with Gerszberg on a long-term marketing plan, strangling the business to the point that Gerszberg's Marc Ecko Enterprises filed for bankruptcy last year, the suit alleges. . . .
>
> Ecko licensee Me & You Accessories, which makes handbags, also has sued Iconix, accusing it of mismanaging the brand."

61.    Defendants ultimately succeeded in their malicious efforts to sabotage the MEE

License Agreement and thereby to cause substantial harm to MEE and Suchman, effectively destroying the value of the MEE License Agreement and Gerszberg's $26.58 million of investment through the Suchman lending arrangement.  As a direct and proximate result of Defendants' wrongful actions, by which they intentionally created MEE's and Suchman's financial distress for the purpose of exploiting it to their advantage:  (a) Defendants were able to implement an oppressive "cram-down strategy," forcing Suchman to sell its membership interest in IPHU to Iconix at a deep discount (or face immediate bankruptcy), so that Iconix could obtain complete ownership and control of IPHU; (b) the MEE companies were forced out of business, among other things leading to closure of the 100+ ECKO and MARC ECKO brand retail store chains; (c) MEE Apparel LLC and MEE Direct LLC were forced into bankruptcy; and (d) Gerszberg, Suchman and MEE suffered tens of millions of dollars of damage.

### G.  The Fraudulent Squeeze-Out Transactions in May 2013

62.     Defendants successfully pushed MEE into a position of increasingly dire financial distress by means of the foregoing bad-faith plans and actions that made MEE unable to meet its guaranteed minimum royalty obligations and unable to pay its creditors.  Knowing that MEE was as a result facing imminent bankruptcy caused by Defendants, Defendants took further advantage of the situation they had created by fraudulently inducing Gerszberg to enter into a squeeze-out transaction in May 2013 (the "2013 Transaction" or "Squeeze-Out Transactions"), pursuant to which Suchman was bought out of IPHU and MEE was terminated as an exclusive licensee, both on unfair, commercially unreasonable terms.

63.     In May 2013, Cole told Gerszberg that IPHU was going to terminate the MEE License Agreement (as he had been planning and threatening to do for months), based on (i) 3TAC's supposed payment defaults (which Defendants themselves had engineered) and

(ii) Cole's purported decision (which was also pretextual) that 3TAC was not a strong master licensee and should be replaced.  Cole, the purported marketing expert and controlling manager of IPHU, told Gerszberg that this decision to replace 3TAC as core licensee was intended to serve the best interests of IPHU's business.  Cole stated that he had analyzed several marketing options and that in his judgment IPHU could and would do better by installing another master licensee in place of 3TAC and MEE to operate the wholesale, retail, and e-commerce businesses of IPHU.

64.     In this connection, Cole said that he was developing a modified business plan for the MEE Brands, across all sectors.  He said that he had been speaking with other parties that could serve as replacement master licensee, and expected to conclude a replacement licensee contract in the next few months.  Cole also stated that had been negotiating with additional wholesale outlets, such as J.C. Penney's, Target, and Walmart, and had plans to expand the wholesale business considerably.[2]  Cole stated that, based on his expertise and experience, he expected the MEE Brands business would generate about $15 million a year in revenues under his modified business plan.  Cole, however, refused to provide Gerszberg with any additional detail regarding these purportedly alternative opportunities for IPHU's go-forward business.

65.     Cole stated that instead of terminating the MEE License Agreement immediately, he would agree to extend 3TAC's license rights through the end of 2014, with a nine-month sell-off period thereafter.  Cole stated that this would be the transition period during which the new replacement license would commence and ramp up its operations, during which MEE could

---

[2]  Cole publicly stated his expectations of growth in the MEE Brands business in a May 24, 2013 press release announcing Iconix's purchase of Suchman's 49% interest in IPHU:  "We believe there is a strong growth opportunity in the youth culture market around the world and are thrilled to increase our equity in the Ecko Unltd. and Cut & Sew brands.  We look forward to continuing to work with our licensees as well as the MEE team to further expand the businesses."

phase out all sales.

66.     At the same time, Cole told Gerszberg that Iconix wanted to buy out Suchman's 49% interest in IPHU, and that Gerszberg (or Suchman) would receive $25 million cash for that interest at a closing.  But Cole further insisted that there must be a simultaneous and combined transaction whereby Iconix would nominally pay $45 million for Suchman's interest, but at the same time IPHU would take back $20 million as purported royalty payments by 3TAC allegedly owed under the MEE License Agreement, as amended.  Cole demanded that any deal be structured in a manner so as to pay Gerszberg $45 million subject to Gerszberg simultaneously paying back $20 million of that $45 million.

67.     Cole did not explain why he insisted upon this back-and-forth structure; he made clear that Gerszberg's only concern should be focusing on the $25 million that Cole said Gerszberg would be paid in cash at closing.

68.     Gerszberg reasonably believed that Cole's stated judgments and representations about the value of the MEE Brands business were based in fact and that this was a good-faith negotiation of a simultaneous license termination and buyout transaction based upon reasonable and good-faith plans and projections by Cole and Iconix based upon their expertise.  Further, Gerszberg reasonably trusted Iconix and Cole because, in addition to having a great deal of experience and expertise in brand management and market analysis, Iconix and Cole, as the majority owner and Administrative Member of IPHU and the controlling manager of IPHU, respectively, had fiduciary duties to act in the best interests of IPHU and its minority member, Suchman.

69.     Accordingly, in reliance upon Cole's representations (made as the manager of IPHU and Iconix) regarding his purported business judgment that it was in IPHU's best interests

28

to replace 3TAC with another master licensee and to move forward with a different, expanded marketing plan, and based upon a purported valuation of the MEE Brands business in light of the modified business plan that Cole represented he was developing, Gerszberg and his companies agreed to enter into simultaneous and combined transactions on May 17, 2013:  (a) Gerszberg, Suchman, Iconix and IPHU executed the Buyout Agreement pursuant to which Suchman sold its 49% equity interest in IPHU to Iconix for (on paper) $45 million in cash plus entitlement to a 10% perpetual royalty stream (described further below); and (b) IPHU and 3TAC entered into a Fourth Amendment to the MEE License Agreement pursuant to which 3TAC's MEE license rights were changed to non-exclusive rights and on that basis were extended to December 31, 2014, with a sell-off period through September 30, 2015, and 3TAC agreed to pay $19 million for those modified rights.

70.     In reliance on Defendants' representations regarding the ongoing value and business plans for the MEE licensing business, Gerszberg, Suchman and 3TAC agreed to certain terms of the 2013 transactions that they would not otherwise have agreed to.

71.     First, 3TAC agreed to pay $19 million for the Fourth Amendment to the License Agreement, which extended the initial license period by only six months but converted it to a less-valuable non-exclusive license for the remaining term.  The $19 million price tag was allocated as follows:  (a) $8,000,000 covering the previously unpaid minimum guaranteed royalty payments that Defendants claimed were owed under the License Agreement (even though it was Defendants' bad-faith, intentionally injurious actions that caused 3TAC to be unable to make those guaranteed royalty payments), (b) $6,000,000 as a flat-fee advance payment for future royalties to be owed for sales from May 17 to December 31, 2013; and (c) $5,000,000 as a pre-paid advance against future royalties for sales from January 1, 2014

29

through September 30, 2015. In other words, 3TAC agreed to pay $8 million to satisfy the disputed claims for past-due royalties and to prepay $11 million for future royalties for the remaining 27 months of the license term – amounts that only made sense if the MEE licensing business would continue as a profitable venture under Defendants' modified business model.

72.    Second, as part of the consideration payable to Suchman for its 49% interest in IPHU, IPHU granted Suchman a perpetual, assignable and non-terminable right to receive 10% of all royalty proceeds earned by IPHU and its affiliates after May 17, 2013, after the first $75,000,000 (including the $11,000,000 prepaid royalties deemed paid by 3TAC on the same date) (the "Perpetual Royalty Stream"), together with certain reporting obligations and auditing rights related to the Perpetual Royalty Stream (as discussed in greater detail below). Again, this type of future royalty-based consideration only made sense if the MEE licensing business would continue as a profitable venture under Defendants' modified business model.

73.    Third, having been induced by Defendants' false pretenses to believe that Defendants were concluding the IPHU joint venture relationship on fair terms and genuinely intended to reinvigorate and expand the MEE Brands business going forward, Suchman also agreed to grant a limited release to Defendants as part of terminating the joint venture relationship. In the Buyout Agreement's mutual release provision, Suchman agreed to release Defendants from claims relating to the IPHU Operating Agreement and/or to IPHU's business activities to the extent such claims did not relate to the MEE License Agreement. (Claims relating to the MEE License Agreement were expressly carved out of both mutual releases.)

74.    In Article 4 of the Buyout Agreement, Iconix and IPHU made a number of representations and warranties to further induce Suchman to enter into the transaction. In particular, in Section 4.6, Iconix and IPHU warranted as follows:

"No Violation of Law.  None of the Iconix Parties is in violation of, and has not been given written notice of any violation of, any law, statute, order, rule, regulation, ordinance, code, ruling, decree or judgment of any Governmental Authority, other than such violations that could not reasonably be expected to have a Material Adverse Effect.  No investigation, proceeding or review relating to the Iconix Parties by any Governmental Authority is pending or threatened, other than such investigations, proceedings or reviews that could not reasonably be expected to have a Material Adverse Effect."

75.     Gerszberg, Suchman and 3TAC would not have agreed to pay the $19 million of past and future advance royalty payments or accepted the deferred perpetual royalty stream compensation if they had realized that the purported going-forward business model was a sham and that Defendants were not acting in good faith but were instead motivated by a bad-faith desire to continue harming the MEE License Agreement and an illegal motive to facilitate their own accounting fraud (as discussed below).  Gerszberg, Suchman and 3TAC similarly would not have agreed to release any of their existing claims under the IPHU Operating Agreement if they had realized that this was not a good-faith buyout transaction but was a cynical ploy to turn IPHU's MEE Brands business into a vehicle for Defendants' fraudulent or otherwise improper accounting techniques.

76.     The 2013 Transaction was nominally predicated upon a valuation of Suchman's equity interest in IPHU as totaling $45 million, but only $25 million was actually paid by Iconix to Suchman or its designees.  The bulk of that $25 million was directed to be paid to Wells Fargo, the principal lender to MEE, to pay off and acquire the Wells Fargo secured loans to MEE.  The unpaid amount of the Wells Fargo debt was far higher than it would have been had it not been for Defendants' multi-year campaign of impairing the MEE License Agreement and MEE businesses so that their revenues would be insufficient to pay off their debt.

77.     The other $20 million was paid by Iconix to IPHU and another Iconix subsidiary to cover payments purportedly due from 3TAC to IPHU.  Thus, the Buyout Agreement provided

that $19,000,000 of the purchase price (otherwise payable from Iconix to Suchman) was instead

to be paid to IPHU in the amounts set forth in the Fourth Amendment to the MEE License

Agreement executed on the same date; and another $1,000,000 was to be paid to ZY Holdings,

the Iconix wholly-owned subsidiary that had purchased the Zoo York brands business from

IPHU in 2011.

78.     Thus, Iconix purported to pay $45,000,000 in cash to obtain Suchman's 49%

interest, only to simultaneously "sweep back" $20,000,000 under the guise of royalty revenues

paid to IPHU and another Iconix subsidiary.  Although Gerszberg did not realize it at the time,

upon information and belief, Defendants' structuring of the transaction this way was a "round-

tripping" accounting trick designed to inflate Iconix's earnings in the second quarter of 2013.

That is, upon information and belief, Defendants "round-tripped" $20,000,000 of the purchase

price from and back to themselves for purposes of deceiving Iconix shareholders and the public

stock market generally.

79.     In addition, Defendants embedded within the Buyout Agreement mechanisms by

which Gerszberg and his businesses would be deprived of any right to the uncollected royalty

receivables that Defendants had intentionally refused to collect (in breach of their fiduciary

duties) while Suchman was a member of IPHU.  Upon information and belief, Defendants were

scheming all along to defer collection of those receivables until after Suchman was squeezed out

of IPHU so that Defendants, in another accounting trick, could credit 100% of those revenues to

Iconix's ledger rather than paying Suchman its fair and bargained-for share.

80.     As a result of the transaction, Gerszberg and his affiliated companies were

simultaneously squeezed out of both their ownership interest and their exclusive licensee status

with respect to the MEE Brands business.  Upon information and belief, as an additional benefit

to acting on Cole's malice and animosity toward Gerszberg, Defendants intended to exploit the squeeze-out of Suchman's ownership in IPHU by positioning Iconix to facilitate future fraudulent round-tripping through IPHU.  Defendants were aware that the round-tripping they implemented only works if the same party owns both sides of the transaction.

81.     As a consequence of Defendants' series of wrongful actions leading to the unfair and fraudulent 2013 Squeeze-Out Transactions, Suchman lost millions of dollars in the form of lost distributions of royalty revenues and loss of the true value of Suchman's ownership interest in IPHU.  Suchman also lost the value of its share of all the royalty receivables that Defendants had intentionally not collected while Suchman was a member of IPHU, all of which were credited to Iconix's sole account in the Buyout Agreement.

### H.  Iconix's Pattern and Practice of Fraudulent Accounting and Securities Fraud

82.     Although Gerszberg did not know it at the time of the 2009 Transaction or the 2013 Transaction, upon information and belief, Iconix and Cole had a long history of engaging in improper and fraudulent accounting practices to manipulate Iconix's earnings and revenues so as to artificially inflate Iconix's stock price.

83.     First, upon information and belief (based upon allegations in an Iconix shareholder complaint filed in New York Supreme Court in 2016), in 2003, the SEC filed a federal civil action and issued an administrative cease-and-desist order against Cole and Candie's (the original name of Iconix) for Cole's involvement in "accounting fraud" in which Cole caused Candie's to misstate earnings and issue false and misleading earnings projections by inflating sales through, *inter alia*, "artificially inflat[ing] revenue by entering into illusory sales transactions" with a barter company.  Cole personally paid a civil penalty of $75,000 to the SEC. Cole's company had previously, in 2000, paid total consideration of $10 million to settle a

stockholder class action alleging the same improper accounting conduct.

84.     Second, although Gerszberg did not know it at the time of the 2013 Transaction, he later learned of several instances where, upon information and belief, Defendants have covertly structured Iconix's business dealings so as to secretly "round-trip" funds from Iconix or one of its affiliates to a third party and then back to Iconix, under the guise of legitimate revenue, so as to fraudulently inflate publicly disclosed earnings.  For example, upon information and belief:

        a.      With respect to Iconix's ROCAWEAR brand (a brand originally founded by Jay-Z and Damon Dash), one or more of the Defendants secretly invested tens of millions of dollars into an otherwise insolvent operating company solely for purposes of funneling that money back to Iconix in the form of pretextual royalty payments which otherwise would not have been booked or earned;

        b.      With respect to Iconix's ED HARDY brand, Iconix and Cole made arrangements with one or more retailers (including Rainbow Shops) for such retailer(s) to make excessively high and commercially unreasonable purchases of ED HARDY branded product subject to agreement(s) to later reimburse such retailer(s) for purported "margin deficits" knowingly and intentionally incurred in connection therewith (and notwithstanding that such outgoing reimbursement payments exceeded applicable incoming royalty payments), all for purposes of deceptively propping up the image and valuation of the brand;

        c.      With respect to IPHU's Ecko Brands, Defendants secretly propped up a manufacturing company doing business as "New Rise" and positioned New Rise as a licensee with guaranteed minimum commitments owed to Iconix and/or IPHU notwithstanding that Defendants knew that New Rise was an effectively insolvent company almost sure to fail,

thereby providing Defendants with a pretextual basis for avoiding a publicly disclosed write-down of overinflated assets which risked adverse impact upon Iconix's public stock valuation.

85.     Third, a number of Iconix accounting improprieties were reported in lawsuits filed by Iconix shareholders alleging securities fraud by Cole, Iconix and other Iconix officers.  The shareholder complaints alleged that the defendants had made false and/or misleading statements and/or failed to disclose to investors that Iconix had underreported the cost basis of its brands and had engaged in irregular accounting practices related to the booking of its joint venture revenues and profits, free-cash flow, and organic growth, with the result that earnings and revenues were overstated and Iconix's statements about its business, operations, and prospects were allegedly false and misleading and/or lacked a reasonable basis.

86.     As noted in the shareholder litigations, in 2013 the SEC began questioning Iconix's accounting practices in comment letters, and that inquiry became a formal investigation in 2015.

87.     In or about August 2015, in the wake of the shareholder litigation and SEC inquiry into Iconix's accounting practices, Iconix issued a public statement stating that Cole had resigned from his positions at Iconix.

88.     Thereafter, based upon the SEC comments and an internal review identifying improper accounting practices, in November 2015 Iconix had to restate its financial results for fiscal years 2013 and 2014 and the first two quarters of 2015.  Iconix then had to restate the same financial results a second time in March 2016 as additional accounting violations came to light.

89.     As also alleged in the shareholder litigations, during the period in 2012-2014 when Iconix's financial results were inflated by its improper accounting practices, (i) Cole received huge performance-based cash bonuses, and other Iconix executives received

performance-based equity awards, based on Iconix's purported meeting of certain earnings performance targets; and (ii) Cole and other Iconix executives sold a great many shares of their Iconix stock at artificially inflated prices in 2013 and 2014.  These facts demonstrate a personal motive of Cole and other Iconix executives to artificially inflate the public stock price through accounting shenanigans, all of which was occurring during the exact time period that the Defendants were engaging in the misconduct alleged herein against Suchman, Plaintiffs' predecessor.

90.     In sum, although Gerszberg did not know it at the time, it is now apparent that the Squeeze-Out Transactions, which Cole and Iconix fraudulently induced Gerszberg and his affiliated companies to enter into based upon affirmative misrepresentations and misleading omissions regarding the value of IPHU and the MEE Brands business, was part and parcel of a larger, ongoing deceptive scheme of accounting gimmicks designed to inflate Iconix's publicly-reported financial performance.  In other words, in the 2013 Transactions, Defendants, consistent with their pattern and practice of improper accounting and bad-faith conduct toward the MEE companies, used Suchman and 3TAC as pawns to advance or conceal Defendants' ongoing securities fraud (which was not revealed until late 2015).

## I.   <u>Defendants' Breach of Warranty</u>

91.     On information and belief (as alleged above based upon certain shareholder litigations and Gerszberg's own current understanding), Iconix and IPHU's "no violation of law" representation and warranty in Section 4.6 of the Buyout Agreement was false when made and at the time of the closing of the May 2013 Transaction.  In 2013 (and more particularly, on or before May 17, 2013), Iconix had been acting in violation of the U.S. securities laws by engaging in improper accounting practices and issuing false and misleading financial statements, and the

SEC had begun a review of Iconix's improper accounting practices.

92.     Gerszberg and Suchman were unaware of the falsity of this representation and warranty at the time of the 2013 Transaction.  Neither Gerszberg nor Suchman would have entered into the May 2013 Transaction if they had known that Iconix and Cole were already violating the securities laws through improper accounting and intended to use Suchman, 3TAC and IPHU to implement fraudulent or otherwise improper accounting techniques in violation of the securities laws.

93.     Had the Defendants provided Suchman with the full and honest disclosure to which it was entitled, Suchman would not have entered into the May 2013 transaction.  Suchman instead would have pursued other action which would have made more sense and been better for the MEE Brands business, and which would have been lawful.  For example, Suchman would have bought out Iconix's interest or arranged for a sale to a third party that would have invoked Suchman's Recombination Right.

94.     In Section 6.3 of the Buyout Agreement, Iconix and IPHU agreed to jointly and severally indemnify Gerszberg and Suchman (and their affiliates, officers, etc.) for "any and all Losses" which "arise out of, are caused by, relate to, or result or occur from or in connection with," among other things, "any breach of or inaccuracy in any representation or warranty made by, or default in performance by any Iconix Party of any covenant or agreement of, any Iconix Party contained in this Agreement."  That indemnification provision is implicated by Defendants' breach of their "no violation of law" warranty.

### J.   Defendants Continue Their Malicious Campaign Even After the 2013 Squeeze-Out

95.     Within a few months after Suchman and 3TAC were fraudulently induced to enter into the 2013 Squeeze-Out Transactions, based upon Cole's and Iconix's false representations

that they were developing a modified business plan with a replacement master licensee, it began to become apparent that Defendants did not actually have a business plan or a replacement licensee.  Upon information and belief, all such representations were knowingly false when made by Cole for the purposes of fraudulently inducing entry into the 2013 Squeeze-Out Transaction.

96.     Even after Iconix acquired 100% ownership of IPHU in the May 2013 Squeeze-Out Transactions, Defendants nonetheless continued their bad-faith campaign of torpedoing any remaining business MEE and 3TAC still had during the remaining course of the MEE License Agreement, with the intention of driving Gerszberg's entire MEE business into financial ruin and bankruptcy.  For example:

a.     Defendants, after misleading Gerszberg in May 2013 to believe that MEE would be able to participate in all channels as a non-exclusive licensee, unreasonably refused to allow MEE to sell Ecko-branded products into JC Penney, but allowed other licensees to do so (including the eventual successor licensee to 3TAC).

b.     Defendants actively sabotaged 3TAC's and MEE's business during the remaining term of the License Agreement by falsely stating to several of 3TAC's (and 3TAC's affiliated sublicensees') actual and/or prospective customers that 3TAC's (and its sublicensees') rights under the MEE License Agreement had terminated, when in fact 3TAC's rights (and its sublicensees' rights) were in full force and effect by way of the fully-paid-for extension embodied in the Fourth Amendment to the MEE License Agreement (such claims at issue in the 3TAC Litigation).

c.     Defendants refused to make any Perpetual Royalty Stream payments or to provide any quarterly royalty reports or to permit any audits of their books and records in accordance with the terms of Section 7.4 of the Buyout Agreement (as discussed further below).

d.      Defendants knowingly applied to register a trademark in bad faith, not for a legitimate business reason but only because they knew that MEE had intended to register and use that mark in connection with its go-forward operations following the May 2013 transaction and maliciously sought to thwart any future business activities of Gerszberg's companies.

97.      Defendants' continuing bad-faith conduct not only destroyed the wholesale and retail businesses of the MEE operating companies but also had a cascading effect of impairing other Ecko Brands licensees' businesses as well, further diminishing royalty revenues from all sources.

### K.  The MEE Operating Companies Were Forced Into Bankruptcy

98.      Defendants' detrimental actions effectively guaranteed that royalty revenues from all sources would fall short of the phony projections Cole used to induce Gerszberg to enter into the Buyout Agreement (with the 10% Perpetual Revenue Stream as partial consideration for the buyout), and the Fourth Amendment to the MEE License Agreement (for which Suchman was required by the terms of the Buyout Agreement to fund $19 million towards 3TAC's purported royalty obligations).

99.      The combined effect of Defendants' multiple destructive acts against the MEE License Agreement and the entire Ecko Brands business brought about, as intended, the destruction of the MEE Brands business.  As a final result of Defendants' multi-year campaign of abuse, oppression, deception, and sabotage, the MEE companies were forced to go out of business and file for bankruptcy protection in 2014.  Specifically, MEE Apparel and MEE Direct, the two principal operating companies in the MEE group, filed a Chapter 11 bankruptcy petition in April 2014.

100.      The bankruptcy filing occurred during the final term of the MEE License

Agreement for which Suchman had paid, on behalf of 3TAC, $5 million advance prepaid royalties to IPHU in May 2013.  Thus, as Defendants intended, Suchman and 3TAC never got the benefit of the royalty stream for which Defendants insisted they pay $5 million in advance.

101.    As a consequence of Defendants' series of wrongful actions, Suchman lost the entirety of the $26,578,265 it had loaned to MEE, as that unsecured debt was extinguished in bankruptcies.

**L.   Defendants Never Honored the Terms of the Perpetual Royalty Stream**

102.    As set forth above, the consideration for Suchman's sale of its membership interests in IPHU to Iconix included IPHU granting to Suchman the Perpetual Royalty Stream, which was a perpetual, assignable and non-terminable right to receive a future royalty stream from revenues derived from licensing the Ecko Brands, anywhere worldwide.

103.    As set forth in Section 7.4(a) of the Buyout Agreement, the Perpetual Royalty Stream was to equal 10% of Royalty Proceeds (a term broadly defined as encompassing "any and all forms of revenue … attributable to and/or in consideration of the offering and/or sale of goods or services from licensing any of the Covered Intellectual Property anywhere worldwide") earned by IPHU and/or its Affiliates on or after the Closing Date (May 17, 2013); provided that the Perpetual Royalty Stream would only begin to be paid after the first $75,000,000 of such Royalty Proceeds received (which was effectively reduced to $64,000,000 after accounting for the $11,000,000 in advance royalty payments paid to IPHU on behalf of 3TAC on the Closing Date).

104.    Absent the grant of the Perpetual Royalty Stream, the purchase price otherwise payable to Suchman in the sale transaction would have been increased by millions of dollars.

105.    As stated in Section 7.4(b) of the Buyout Agreement, Suchman's right to receive

the Perpetual Royalty Stream was a material condition underlying Suchman's sale of its membership interests in IPHU to Iconix.

106.    IPHU agreed to report and pay the Perpetual Royalty Stream on a quarterly basis. More specifically, Section 7.4(e) of the Buyout Agreement (titled "Payments and Statements") provides that on or before the forty-fifth (45th) day after the end of each calendar quarter, IPHU shall (i) make royalty stream payments arising in the prior quarter as determined in accordance with generally accepted accounting principles, and (ii) "provide to Suchman a reasonably detailed statement certified as true and accurate by IPHU's Chief Financial Officer setting forth the computation of the amounts due to Suchman in respect thereof, and such other information and/or material as may be reasonably requested by Suchman."

107.    In Section 7.4(i) of the Buyout Agreement, Suchman was granted mechanisms and protections to ensure that Suchman's rights in and to the Perpetual Royalty Stream would be preserved and protected in the event that IPHU were to sell, transfer or otherwise dispose of the rights to any Covered Intellectual Property (the "Transfer Protections").

108.    In Section 7.4(j) of the Buyout Agreement, Suchman was granted mechanisms and protections to ensure that Suchman's rights in and to the Perpetual Royalty Stream would be preserved and protected in the event that IPHU (and/or any of its affiliates, successors and/or assigns) were to change their respective business models so as to no longer operate within the framework of a royalty-bearing arrangement (the "Change in Operation Protections").

109.    The Buyout Agreement also granted Suchman the right to audit IPHU's books and records covering all transactions relating to the Buyout Agreement, including the calculation of the Perpetual Royalty Stream (the "Audit Right").  As set forth in Section 7.4(h) of the Buyout Agreement, the Audit Right was unconditional, with the only limitations being that any audit (a)

had to be conducted during regular business hours, and upon fourteen (14) days' advance written notice; and (b) was limited to a maximum of one audit per 12-month period with no two audits covering transactions during the same period (provided that Suchman was given access to all relevant requested documentation during the first such audit).

110.    As set forth in Section 7.4(c) of the Buyout Agreement, Iconix guaranteed full payment of the Perpetual Royalty Stream and Iconix and IPHU (together with their successors and assigns, if any) agreed to be jointly and severally liable therefor.

111.    On or about June 11, 2014, all of Suchman's right, title and interest in and to the Perpetual Royalty Stream were transferred to EGRHC, and Defendants were put on notice of same.  From that date forward, Defendants' Perpetual Royalty Stream obligations were owed to EGRHC.

112.    However, Defendants to date have never honored any of their obligations relating to the Perpetual Royalty Stream.  Upon information and belief, Defendants never intended to honor those obligations, and simply included that deferred compensation term in the Buyout Agreement as a phony construct to bolster the pretense of a good-faith plan and intention to operate a profitable MEE Brands licensing business going forward.

113.    In particular,

(a)    Defendants never made any payments to Suchman and/or EGRHC in connection with the Perpetual Royalty Stream;

(b)    Defendants never delivered to Suchman and/or EGRHC any statements, reports and/or computations in connection with the Perpetual Royalty Stream;

(c)    Defendants have refused to disclose any information concerning IPHU's sales, transfers or other dispositions of the rights to the Covered Intellectual Property (or any of

it), thereby eviscerating EGRHC's Transfer Protections;

        (d)     Defendants have refused to disclose any information concerning any change in the business models of IPHU (and/or any of its affiliates, successors and/or assigns), thereby eviscerating EGRHC's Change in Operation Protections; and

        (e)     Defendants have refused to allow EGRHC to conduct an audit of IPHU's books and records with respect to the Perpetual Royalty Stream in accordance with the express conditions set forth in Section 7.4(h) of the Buyout Agreement (which EGRHC met), instead improperly demanding the satisfaction of additional onerous conditions beyond those authorized in the Buyout Agreement.

### FIRST CLAIM FOR RELIEF
### Breach of Fiduciary Duty / Aiding and Abetting

        114.     Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, the allegations contained in paragraphs 1-113 above.

        115.     Gerszberg is the successor-in-interest to Suchman's claims of breach of fiduciary duty.

        116.     There was a fiduciary relationship between Iconix and Cole, on the one hand, and Suchman and Gerszberg, on the other, insofar as the joint-venture relationship was founded upon trust or confidence reposed by Gerszberg and Suchman in the integrity and fidelity of Cole and Iconix.  Suchman and Gerszberg relied upon Iconix and Cole's superior expertise and knowledge in the field of brand management, and a reasonable expectation that Iconix and Cole would engage in good-faith exercise of business judgment in the best interests of IPHU and the MEE Brands business.

        117.     Iconix and Cole affirmatively undertook to control and manage the MEE Brands joint venture, IPHU, and did in fact exercise control over IPHU's decisions and actions.  Iconix

and Cole knew that Suchman and Gerszberg were relying on them for their brand marketing expertise, business judgment, and record-keeping, and encouraged that reliance.  As such, Iconix and Cole owed equitable fiduciary duties of due care, loyalty, and good faith and fair dealing to Suchman and Gerszberg.

118.    Iconix, by virtue of its status as the majority interest holder and Administrative Member of IPHU, owed fiduciary duties to Suchman, the minority interest holder, and to IPHU itself.  Cole individually, by virtue of his status as the manager of IPHU holding majority voting power, owed fiduciary duties to Suchman and IPHU.  Iconix and Cole had fiduciary duties to act in good faith, with reasonable care and on an adequately informed basis, in the best interests of the company and both of its owners, and to refrain from actions that benefit themselves to the detriment of Suchman or the company as a whole.

119.    In particular, in connection with the negotiation of the May 2013 transactions, which were self-interested transactions, Iconix and Cole had a fiduciary duty to make full disclosure of all material facts relating to the company's operations and the proposed transactions to Suchman.

120.    The IPHU Operating Agreement (§ 11.06) specifically confirmed Cole's duty, as Manager, to manage the company's business and affairs "in a manner he believes in good faith to represent the care an ordinarily prudent person in a like position would exercise under similar circumstances," "in good faith reliance on the provisions of this Agreement," "without intentional misconduct or a knowing violation of law," and "without engaging in any transaction for which he receives a personal benefit in violation or breach of any provision of this Agreement"; and Iconix's duty, as a member, to refrain from "any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair

dealing" and from "any transaction in which [it] receives a personal benefit in violation or breach of any provision of this Agreement."

121.   As described above, Iconix and Cole breached their fiduciary duties, repeatedly, in committing numerous bad-faith, intentionally harmful actions in 2010-2013, including (without limitation) sabotaging the MEE Brands marketing program that Suchman was attempting to implement and dismantling the successful Skechers marketing program that inured to the benefit of the entire MEE Brands business; failing and refusing to collect revenues and pursue enforcement efforts against non-Gerszberg-affiliated MEE licensees so as to reduce revenues flowing to Suchman; making deals with licensees that benefited Iconix to the detriment of Suchman; taking actions and decisions intended to increase the cost of Suchman's and MEE's debt service; making wrongful threats of termination of, and ultimately terminating, IPHU's strongest and most profitable licensee, 3TAC, without having any successor licensee in place; and those other wrongful acts detailed in this Complaint.

122.   Defendants Iconix and Cole further breached their fiduciary duties by falsely pretending that their actions, inactions and decisions were based upon the reasonable, good-faith exercise of their business judgment and considerable marketing expertise, when in fact they were not, but were instead driven by Defendants' malicious and bad-faith scheme to financially ruin Gerszberg and his businesses including by virtue of Cole's punitive objective to cram-down and/or squeeze-out his business partner which, in turn, permitted Defendants' to further their illicit scheme to defraud Iconix's shareholders by padding earnings statements.

123.   Defendants' breaching conduct throughout the 2010-2013 period involved fraud, intentional misconduct, knowing violation of law, waste of company assets, self-dealing, lack of good faith and fair dealing, and/or at a minimum gross negligence.

124.     Defendants' pattern and practice of bad-faith misconduct was intended to, and did, greatly diminish the value of the MEE License Agreement and the overall MEE Brands business.  As a direct and proximate result of Defendants' breaches of fiduciary duty, individually and in combination, the MEE Brands marketing program was decimated, royalty revenues payable to IPHU from all sources were reduced, distributions to Suchman were reduced (both in percentage and total amount), Suchman was thereby unable to fund 3TAC's and the other MEE operating companies' operations, and 3TAC was unable to pay the minimum royalty payments due to 3TAC – creating a convenient (and premeditated) excuse for IPHU to declare 3TAC in default and use that as justification to terminate the exclusive license, demand further excessive royalty payments, and buy out Suchman's devalued interest in IPHU at a depressed price.  The MEE Brands businesses of Gerszberg's affiliated MEE operating companies were unable to recover from Defendants' multi-year campaign of intentional battering and were ultimately forced into bankruptcy.

125.     As a direct and proximate result of Defendants' breaches of fiduciary duty, Suchman sustained tens of millions of dollars of damages in the form of lost sales and distributions of royalty revenues, loss of the true value of Suchman's ownership interest in IPHU, loss of the advance prepaid royalty payments Suchman made on 3TAC's behalf, increased debt service costs, and loss of more than $26.58 million when the Suchman-MEE Loan was wiped out in the MEE bankruptcy.

126.     IPHU materially aided and abetted Iconix and Cole's breaches of fiduciary duty. IPHU knew that its controlling member and manager, Iconix and Cole, owed fiduciary duties to Suchman and Gerszberg.  IPHU, as directed by Cole, knowingly participated in and substantially assisted Iconix's and Cole's intentionally harmful (or at least grossly negligent) actions,

inactions and decisions taken in breach of their fiduciary duties, as described above.

127.    IPHU knowingly aided and abetted Iconix's and Cole's breaching actions by, *inter alia*, failing and refusing to collect royalties due to IPHU from its non-Gerszberg-affiliated licensees; entering into deals with licensees that benefited Iconix to Suchman's detriment; failing and refusing to reimburse MEE for legitimate marketing expenses; and failing and refusing to provide material information that Suchman (as a member of IPHU) and Gerszberg (as the minority manager of IPHU) were entitled to receive, so as to conceal and facilitate Cole's and Iconix's misconduct.

128.    Insofar as all three Defendants were complicit in the breaches of fiduciary duty, they should be held jointly and severally liable for all damages caused thereby and all unjust enrichment obtained thereby.

129.    Plaintiffs do not know the full extent of the injuries and damages caused by Defendants' breaches of fiduciary duty, due to the fact that Defendants controlled the books and records of IPHU, engaged in improper accounting practices, and concealed information from Suchman and 3TAC regarding material transactions and developments.

130.    By reason of the foregoing, Plaintiffs are entitled to (a) a full accounting of the revenues, expenses, profits, losses, and transactions of IPHU from its inception to date; (b) restitution of any amounts wrongfully obtained or retained by Iconix or Cole as a result of self-dealing or unjust enrichment to Suchman's detriment; (c) compensatory damages, in an amount to be shown at trial but believed to be in excess of $50 million, for losses to Suchman caused by Defendants' multiple, compounded breaches of fiduciary duty; (d) reformation of the terms of the May 2013 Buyout Agreement to redress Iconix's and Cole's bad faith and overreaching; and (e) punitive damages due to Defendants' bad faith and their wanton, willful,

intentionally harmful conduct.

**SECOND CLAIM FOR RELIEF**
**Fraudulent Inducement of 2013 Transaction**

131.     Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, the

allegations contained in paragraphs 1-113 above.

132.     In May 2013, Cole, on behalf of Iconix and IPHU, fraudulently induced

Gerszberg to agree (on behalf of Suchman and 3TAC) to enter into the Buyout Agreement and

the Fourth Amendment to the MEE License Agreement, by (a) making affirmative

misrepresentations to Gerszberg regarding the value and status of the MEE licensing business

and Cole's purported business judgments, plans, and revenue projections for the MEE licensing

business going forward, and (b) omitting to disclose material information (which Iconix and Cole

had a duty to disclose) regarding the true nefarious motives for the transactions.

133.     Cole stated that he intended to terminate 3TAC as master licensee and replace it

with another licensee because in his judgment the change would improve the MEE Brands' value

and be in the best interests of the MEE licensing business.  Cole made several other affirmative

statements regarding his plans for marketing the brands, including by expanding the wholesale

sales channels to include JC Penney's, Walmart, Target, and other department stores that the

MEE brands had not previously been marketed to.  He stated specific projections of revenues he

expected would be generated, approximately $15 million a year, from the restructured MEE

licensing business and his planned going-forward marketing options for the wholesale and retail

sectors.

134.     These representations all went to the fundamental valuation of IPHU's business,

and were essential to a fair negotiation of the terms of the MEE License Amendment and the

buyout transaction, regardless of whether it was Iconix or Suchman that would be buying out the

48

other.  The entire discussion was predicated on Gerszberg's reasonable belief and understanding, which Cole created, that this was a good-faith assessment of a legitimate buyout transaction based upon reasonable business projections and a fair valuation of the company.

135.    Only later, after the MEE license business declined and no replacement licensee materialized, did Gerszberg come to realize that the negotiation had been a sham and the transaction terms had nothing to do with the MEE Brands' market value, going-forward options, or alternative business models with replacement licensees.  Rather, the "negotiation" and the terms of the transaction were driven solely by Iconix's wish to eliminate Suchman and acquire full ownership of IPHU so that it could be used to advance Iconix's illegal round-tripping scheme.

136.    All of Iconix and Cole's representations about their business judgments, alternative marketing plans, and projected revenues were false and misleading statements of then-existing fact, because Iconix and Cole were not in fact making good-faith business judgments and employing their market analysis skills and expertise to formulate a business strategy in the best interests of the MEE brands.  Defendants were not genuinely planning a restructured business model with $15 million per year in minimum royalty revenues, as they said they were, and apparently did not have a reasonable basis for their projections at the time they stated them.

137.    Iconix and Cole told Gerszberg those things to create the false impression that they were acting in good faith as reasonable business people for economically rational, legitimate business purposes that Gerszberg would understand and believe.  They knew and intended that Gerszberg would rely on Cole's statements in good faith to make an informed decision regarding the current and prospective value of IPHU's MEE Brands business and the MEE License

Agreement.  In truth, however, Iconix and Cole were not motivated by such economically rational and legitimate business purposes but only by securing a wholly-owned vehicle through which they could commit phony accounting and securities fraud.

138.    Iconix and Cole, who had a fiduciary duty to disclose all material information in the buyout negotiation, concealed this highly material information about their true, illegal motives, and made knowingly false representations going to the value and viability of IPHU's MEE licensing business because they knew that those representations would induce Gerszberg, a rational businessperson, to accede to the buyout transaction on Iconix's terms.

139.    Iconix and Cole also failed to disclose the material information that, although the wholesale channel would be expanded to include JC Penney, that option would be offered only to the non-Gerszberg-affiliated licensees and not to the MEE companies.  Iconix and Cole misleadingly stated that 3TAC as a non-exclusive licensee would operate on a par with all other non-exclusive licensees.  They intentionally and misleadingly omitted to disclose that they intended to exclude 3TAC from the expanded channels and put it in an even more disadvantaged position vis-à-vis other licensees.

140.    Suchman and Gerszberg reasonably and justifiably relied on Defendants' misrepresentations and omissions of material fact in (a) believing that the membership buyout and license amendment offers were made in good faith and based on economically sound business plans and reasonable revenue projections and (b) therefore entering into the Buyout Agreement and Fourth Amendment to the MEE License Agreement, which both had terms tied to future Ecko Brands royalty revenues.

141.    Gerszberg reasonably believed that the modified business plan and projections Cole cited were sensible and genuinely based upon Cole's business judgment and expertise and

50

had a reasonable basis in fact, because although Cole was a tyrant, he was also an experienced brands marketing executive who knew how to run a successful business. Gerszberg believed that once Iconix had acquired 100% of IPHU, Defendants would be incentivized to appropriately market and support the Ecko Brands business so as to maximize royalties flowing to IPHU from all sources, because that would be economically rational.

142.   In particular, Gerszberg reasonably believed Cole's representations that he had a replacement licensee to begin serving as master licensee of the MEE brands, because it would make no economic sense to terminate the master licensee, which had been responsible for $20 million a year in revenues, without having a replacement licensee ready to take over. Gerszberg believed that Cole would rationally exercise his business judgment to advance IPHU's interests.

143.   Defendants' knowing and intentional affirmative misstatements and concealment of material information (including their ulterior motives to facilitate an illegal scheme and to continue destroying MEE's business), were intended to and did induce Suchman and 3TAC to enter into the Buyout Agreement and Fourth Amendment to the MEE License Agreement on economic terms that were unfairly favorable to Iconix. In addition to the fact that the transaction reflected a valuation of Suchman's interest in IPHU at a depressed price (which resulted in large part from Defendants' years of sabotage), the Perpetual Royalty Stream that Suchman agreed to accept as part of the consideration for its 49% membership interest would turn out to be wholly illusory, as Defendants knew. Suchman also agreed to pay, on behalf of 3TAC, $11 million in prepaid royalties for a non-exclusive license of the MEE brands for 18 months, which also turned out to be illusory because of Defendants' continuing destructive acts.

144.   If Gerszberg had known that Defendants' representations and offers were not made in good faith and were not tethered to any genuine business plans or reasonable business

valuation, he and his affiliated entities would not have entered into either the Buyout Agreement or the Fourth Amendment to the MEE License Agreement.  Gerszberg would not have agreed to structure a deal based on payment of past due royalties had he known that Defendants had adopted such structure for purposes of implementing fraudulent, illegal or otherwise improper accounting methodologies.  Gerszberg would not have agreed to accept the terms tied to future revenues if he had known that the MEE brands business was going to be grossly (and intentionally) mismanaged and sabotaged following his departure.  Gerszberg also would not have allowed his MEE licensing business, which he had spent decades developing, to be hijacked by Iconix and Cole and turned into a pawn in their illegal, fraudulent accounting scheme.  And neither he nor any of his businesses would have agreed to release any claims against Defendants relating to their past misconduct regarding the IPHU joint venture.

145.    EGRHC, as successor in interest to Suchman's rights to the perpetual royalty stream under the Buyout Agreement, was injured when the perpetual royalty stream promised to be paid to Suchman as partial consideration for its 49% interest in IPHU was revealed to be wholly illusory and false.

146.    Gerszberg, as successor in interest to Suchman's other rights and claims against Defendants, was injured, among other ways, by (a) losing the $19 million that Suchman paid to IPHU on 3TAC's behalf to cover $8 million of supposedly past-due royalties and $11 million in advance royalty payments to obtain an 18-month license term that was illusory and subject to Defendants' continuing assaults, (b) losing the value of more than $26 million of other funds that Suchman had loaned to or invested in the MEE Brands business, (c) losing the true value of Suchman's 49% interest in IPHU's MEE licensing business, (d) losing the value of Suchman's share of all the royalty receivables that Defendants had intentionally not collected while

Suchman was a member of IPHU, all of which were credited to Iconix's sole account in the Buyout Agreement, and (e) granting, in connection with the Buyout Agreement, a release of Defendants from any claims other than those relating to the MEE License Agreement.

147.    By reason of the foregoing, Plaintiffs are entitled to (a) a full accounting of the revenues, expenses, profits, losses, and transactions of IPHU, so as to allow for a proper valuation of Suchman's interest therein; (b) reformation and/or voiding of certain terms of the Buyout Agreement (including the economic terms and the limited release), so as to more closely comport with the terms the parties would have agreed to absent Defendants' fraud and breach of fiduciary duty; (c) compensatory and/or rescissionary damages, in an amount to be shown at trial but believed to be in excess of $50 million, for losses to Suchman caused by Defendants' fraudulent inducement; (d) restitution or disgorgement of any amounts wrongfully obtained or retained by Defendants at Suchman's expense as a result of Defendants' fraudulent inducement; and (e) punitive damages due to Defendants' bad faith and their wanton, willful, intentionally harmful conduct.

## THIRD CLAIM FOR RELIEF
### Breaches of 2013 Buyout Agreement

148.    Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, the allegations contained in paragraphs 1-113 above.

149.    Suchman and Defendants Iconix and IPHU were parties to the Buyout Agreement.

150.    Suchman performed its obligations under the Buyout Agreement.

151.    As set forth above, part of the consideration for Suchman's sale of its membership interests in IPHU to Iconix included IPHU granting to Suchman a right to a 10% Perpetual Royalty Stream, as defined in Section 7.4(a) of the Buyout Agreement.

152.     Section 7.4(e) of the Buyout Agreement provided that IPHU would make royalty payments and provide certified revenue statements on the 45th day after the end of each calendar quarter.  Section 7.4(h) of the Buyout Agreement granted Suchman the associated right to audit IPHU's books and records, subject to very limited conditions.

153.     As stated in Section 7.4(b) of the Buyout Agreement, Suchman's right to the Perpetual Royalty Stream was "an express purpose and condition of Suchman's entry into this Agreement" – *i.e.*, this was an essential element of the consideration given in exchange for Suchman's 49% interest.

154.     In Section 7.4(c) of the Buyout Agreement, Iconix guaranteed full payment of the Perpetual Royalty Stream, and Iconix and IPHU agreed to be jointly and severally liable therefor.

155.     EGRHC is the successor-in-interest to all of Suchman's rights in and relating to the Perpetual Royalty Stream under the Agreement, pursuant to an assignment as expressly permitted by Section 7.4(a) of the Buyout Agreement of which Iconix and IPHU were given notice.

156.     Iconix and IPHU never performed any of their obligations related to the Perpetual Royalty stream.  They never made any Perpetual Royalty Stream payments to Suchman or EGRHC; they never delivered to Suchman or EGRHC any statements or computations in connection with the Perpetual Royalty Stream; they refused to disclose any information concerning IPHU's sales, transfers or other dispositions of any of its Covered Intellectual Property rights; they refused to disclose any information concerning any change in IPHU's business models; and they refused to allow EGRHC to conduct an audit of IPHU's books and records with respect to the Perpetual Royalty Stream absent the imposition of additional unwarranted conditions not authorized in the Buyout Agreement.

157.    Iconix and IPHU's failures to perform breached the express contractual provisions of Sections 7.4(a), 7.4(e), 7.4(h), 7.4(i) and 7.4(j) of the Buyout Agreement.  These were material breaches of essential provisions concerning the consideration to be paid to Suchman in exchange for giving up its 49% interest.

158.    Iconix and IPHU's acts and omissions described above also breached the implied covenant of good faith and fair dealing in the Buyout Agreement, insofar as they (intentionally) deprived Suchman and EGRHC of the consideration and benefits Suchman was promised in the Buyout Agreement.  Suchman never received the full consideration promised to it in exchange for giving up its membership interests in IPHU.

159.    As a direct and proximate result of these breaches, Plaintiff EGRHC has sustained and continues to sustain damages, for which Iconix and IPHU are jointly and severally liable pursuant to § 7.4(c) of the Buyout Agreement.

160.    As set forth above, Defendants Iconix and IPHU also breached Section 4.6 of the Buyout Agreement, in which Iconix and IPHU had represented and warranted that they were not in violation of, and had not been given written notice of any violation of, any law, statute, etc.; and that no investigation, proceeding or review by any Governmental Authority was pending or threatened.

161.    That warranty was breached because apparently Iconix had been acting in violation of the U.S. securities laws by engaging in improper accounting practices and issuing false and misleading financial statements; and an SEC review of Iconix's improper accounting practices was already pending and was likely to become a full-scale investigation.

162.    As set forth above, Suchman was damaged by relying on this inaccurate warranty, as Suchman was thereby unwittingly induced to sell its 49% interest in IPHU for insufficient

consideration to a company, Iconix, that was not operated in a legally compliant manner, when it would have been better for the MEE Brands business if Suchman had bought out Iconix's interest or arranged for a sale to a third party pursuant to Suchman's Recombination Right.

163.     Iconix and IPHU are jointly and severally liable to Plaintiffs (Suchman's successors) for (a) indemnification, pursuant to Section 6.3 of the Buyout Agreement, for any Losses arising from the foregoing warranty breaches and/or defaults in their performance of their covenants and agreements, and/or (b) all damages suffered as a result of Defendants' willful misconduct, intentional misrepresentations, and fraudulent breaches of their warranties and representations and other contractual obligations described above.

164.     By reason of the foregoing, Plaintiffs are entitled to (a) specific performance in the form of a full and unrestricted audit and equitable accounting of all of IPHU's books, records, revenues, dealings and transactions in any way related to the Perpetual Royalty Stream worldwide since May 17, 2013, (b) compensatory damages in an amount to be shown at trial, (c) indemnification of Losses in an amount to be shown at trial, and (d) legal costs, including reasonable attorneys' fees, pursuant to § 9.3 of the Buyout Agreement.

### FOURTH CLAIM FOR RELIEF
### Breach of IPHU Operating Agreement

165.     Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, the allegations contained in paragraphs 1-113 above.

166.     Suchman and Iconix were parties to the IPHU Operating Agreement.  Gerszberg was a representative of Suchman and a member of the IPHU Board of Managers pursuant to the IPHU Operating Agreement.

167.     Gerszberg and Suchman performed their obligations under the IPHU Operating

Agreement, to the extent they were able to despite Defendants' misconduct, at all times from 2009 to 2013.

168.    Iconix failed properly to perform its obligations as Administrative Member under the IPHU Operating Agreement, including through its acts and omissions and the acts and omissions of its designee on the Board of Managers, Cole, as described above, that impaired the MEE License Agreement with IPHU's most important licensee and diminished IPHU's MEE Brands licensing business overall.

169.    The above-described acts and omissions of Iconix and Cole, its designee, breached the implied covenant of good faith and fair dealing in the IPHU Operating Agreement, insofar as they diminished the fundamental value of IPHU's MEE Brands licensing business, impaired Suchman's ability to obtain the benefits promised in the Operating Agreement (such as higher distribution percentages and total payments), and thereby deprived Suchman of the true value of its 49% interest in IPHU's MEE Brands licensing business.

170.    Defendants' acts and omissions, as described above, were done in bad faith, with the intention and effect of diminishing the value of the MEE License Agreement with 3TAC (IPHU's most important licensee) and preventing Suchman from receiving the full benefits of the IPHU Operating Agreement and the MEE Brands business.

171.    As a direct and proximate result of Iconix's breaches, Suchman sustained millions of dollars of damages.

172.    By reason of the foregoing, Gerszberg, as the successor-in-interest to Suchman's claims, is entitled to compensatory damages, in an amount to be shown at trial but believed to be in excess of $50 million, for losses to Suchman caused by the breaches of the IPHU Operating Agreement.

## FIFTH CLAIM FOR RELIEF
### Unjust Enrichment

173.    Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, the allegations contained in paragraphs 1-113 above.

174.    Defendants were enriched at the expense of Suchman and Plaintiffs, including by virtue of Defendants' acquisition in May 2013 of Suchman's entire 49% interest in IPHU and receipt of other benefits at an unfairly discounted price and without paying the full consideration promised therefor; their acquisition of the full value of the legacy receivables that they had intentionally failed to collect during the time Suchman was a 49% member of IPHU; and in other ways that are not presently known or quantifiable by Plaintiffs given Defendants' false and misleading statements and withholding of records and information over the years.

175.    It is against equity and good conscience to permit Defendants to retain such unfairly obtained benefits.

176.    Defendants, each controlled by Cole, were complicit in their bad faith and willful misconduct and should be held jointly and severally liable for all amounts by which they were unjustly enriched.

177.    By reason of the foregoing, Plaintiffs are entitled to restitution of the amounts Defendants have unjustly obtained or retained through their multi-year course of misconduct targeting the MEE License Agreement and the MEE Brands businesses and their fraudulently inducing Suchman to give up its entire 49% interest in IPHU (and to pay $19 million for 3TAC's non-exclusive license) in exchange for promised consideration that Defendants knew and intended they would never provide.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgment in their favor and against Defendants as follows:

a.      ordering a full accounting of the revenues, expenses, profits, losses, and transactions of IPHU from its inception to date;

b.      partially voiding and/or reforming certain of the terms and provisions of the May 2013 Buyout Agreement to redress Iconix's and Cole's bad faith, fraud and overreaching;

c.      ordering specific performance of the Buyout Agreement in the form of a full and unrestricted audit of all of IPHU's books and records and/or an equitable accounting by Defendants of all of IPHU's worldwide revenues, expenses, dealings and transactions since May 17, 2013;

d.      awarding compensatory damages, including consequential and incidental damages, for Defendants' fraudulent and bad-faith breaches of fiduciary duty arising prior to the 2013 Squeeze-Out Transactions, their fraudulent inducement of the 2013 Squeeze-Out Transactions, their ongoing willful and destructive misconduct targeting the MEE License Agreement in 2013-2014, and their failure to pay sums due and owing under the Perpetual Royalty Stream;

e.      granting restitution or disgorgement of any amounts unjustly obtained or retained by any of the Defendants at any time;

f.      imposing punitive damages due to Defendants' bad faith and their wanton, willful, intentionally harmful conduct;

g.      awarding Plaintiffs pre-judgment and post-judgment interest;

h.      awarding Plaintiffs the costs, expenses and disbursements of this action, including

reasonable attorneys' fees pursuant to the Buyout Agreement and/or to the extent allowable by

law; and

      i.      granting such other and further relief as the Court deems just and proper;

      j.      With all the foregoing amounts estimated to exceed $100 million.

Dated:  November 1, 2017           DONNENFELD LAW PLLC

                                     By:    /s/ Gregg Donnenfeld, Esq.
                                          Gregg Donnenfeld, Esq.
                                  37 Northern Blvd., #280
                                  Greenvale, NY 11548
                                  917-251-2452

                                  Monica Hanna, Esq.
                                  HANNA LAW LLC
                                  814 Willow Ave., Suite 5RR
                                  Hoboken, NJ 07030
                                  (201) 739-9780
                                  HannaLawLLC@gmail.com

                                  *Attorneys for Plaintiffs*
                                  *Seth Gerszberg and EGRHC, LLC*