**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
SETH GERSZBERG and EGRHC, LLC,  :
              :   Case No. 17-cv-08421 (KBF)(RWL)
     Plaintiffs,   :
              :
  vs.         :
              :   **ORAL ARGUMENT REQUESTED**
ICONIX BRAND GROUP, INC.,   :
IP HOLDINGS UNLTD., LLC, and  :
NEIL COLE,       :
              :
     Defendants.   :
------------------------------------------------------------------x


## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

Gregg Donnenfeld, Esq.
DONNENFELD LAW PLLC
37 Northern Blvd., #280
Greenvale, NY 11548
917-251-2452

Monica Hanna, Esq.
HANNA LAW LLC
814 Willow Ave., Suite 5RR
Hoboken, NJ 07030
(201) 739-9780

*Attorneys for Plaintiffs*
 *Seth Gerszberg and EGRHC, LLC*

January 15, 2018

## Table of Contents

Table of Authorities……………………………………………………………………iii

Preliminary Statement…………………………………………………………………..1

Summary of Plaintiffs' Allegations………………………………………………………..1

    A.  The Parties……………………………………………………………………1

    B.  The 2009 Transaction……………………………………………………………...2

    C.  The Interconnectivities Between Plaintiffs, Defendants, and the MEE License ………….3

    D.  Defendants' Bad-Faith Malicious Activities………………………………………………4

    E.  Fraudulent Inducement…………………………………………………………4

    F.  The 2013 Transactions..………………………………………………………...6

    G.  Defendants' Fraudulent Accounting and Securities Fraud……………………………..7

Argument……………………………………………………………………………7

    I.  PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE LIMITED RELEASE………..7

        A.  Plaintiffs' Claims Are Outside Of The Scope of the Limited Release………………..8

        B.  In Any Event, the Limited Release is Null and Void
           Because it was Fraudulently Induced…………………………………………...11

    II.  PLAINTIFFS STATED A CLAIM FOR BREACH OF FIDUCAIRY DUTY
       AND AIDING AND ABETTING…………………………………………………...13

        A.  IPHU's Operating Agreement Did Not Eliminate Fiduciary Duties…………………13

        B.  Plaintiffs' Breach of Fiduciary Duty Claim Is Not Duplicative………………………16

           (1) Cole Is Not A Party to IPHU's Operating Agreement……...................................16

           (2) Plaintiffs' Claim Arises Independently From General Fiduciary Principles
               Rather Than From Specific Contractual Obligations……………………………17

        C.  IPHU Can Be Held Liable for Aiding and Abetting its Affiliated Entities……………19

III. PLAINTIFFS STATED A CLAIM FOR BREACH OF
OPERATING AGREEMENT…………............................................................20

IV. PLAINTIFFS STATED A CLAIM FOR FRAUDULENT INDUCMENT……………..20

    A.  Promises Made With Intentions Not to Perform Constitute
Actionable Misrepresentations……………………………………………………20

    B.  Plaintiffs Sufficiently Alleged Reasonable Reliance…………………………………21

V.  PLAINTIFFS' UNJUST ENRICHMENT CLAIM IS NOT DUPLICATIVE…………..23

    A.  Cole is Not a Party to Any of the Underlying Contracts……………………………..23

    B.  Plaintiffs' Unjust Enrichment Claims Are Predicated on Conduct
Not Covered by Contract and Otherwise Stem From
Defendants' Misrepresentations and Fraud………………………………………..23

    C.  Plaintiffs Have a Right to Plead Claims in the Alternative……………………………23

VI. PLAINTIFFS STATED A CLAIM FOR BREACH OF THE
BUYOUT AGREEMENT………………………………………………………………24

Conclusion……………………………………………………………………………………..25

**Table of Authorities**

**Rules**

Federal Rule of Civil Procedure 8(d)…..………………………………………………..19, 24

Federal Rule of Civil Procedure 12(b)(6)…………………………………………………1


**Cases**

*2009 Caiola Family Trust v. PWA, LLC*,
    C.A. No. 8028-VCP. 2014 Del. Ch. LEXIS 261 (Del. Ch. Dec. 18, 2014)………………..16

*Allied Capital Corp. v. GC-Sun Holdings, L.P.*,
    910 A.2d 1020 (Del. Ch. 2006) …………………………………………………………19

*Allstate Ins. Co. v. Lyons*,
    843 F. Supp. 2d 358, 376 (E.D.N.Y. 2012)…………………………………………...23

*Bay Ctr. Apts., Owner, LLC v. Emery Bay PKI, LLC*,
    C.A. No. 3658-VCS, 2009 Del. Ch. LEXIS 54 (Del. Ch. Jan. 30, 2015)……………14, 16

*Board of Mgrs. of 325 Fifth Ave. Condo. v. Continental Residential Holdings LLC*,
    Case No. 154764/12, 2016 N.Y. Misc. LEXIS 2423 (N.Y. Cty. June 27, 2016)………..13

*Burtch v. Opus, LLC*,
    528 B.R. 30 (Bank. Ct. Del. 2015)…………………………………………………15

*Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V.*,
    17 N.Y.3d 269 (2011)……………………………………………………..…..11, 12

*Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*,
    4 N.Y.2d 403 (1958)…………………………………………………….……..21

*DiFolco v. MSNBC Cable L.L.C.*,
    622 F.3d 104 (2d Cir. 2010)…………………………………………….……1

*EQT Infrastructure Ltd. v. Smith*,
    861 F. Supp. 2d 220 (S.D.N.Y. 2012)…………………………………….…20, 21

*Freeley v. NHAOCG, LLC*,
    62 A.3d 649 (Del. Ch. 2012)…………………………………………………..15

*Grayson v. Imag. Stn., Inc.*,
    C.A. No. 5051-CC, 2010 Del. Ch. LEXIS 169 (Del. Ch. 2010)…………………………18

*Great Earth Cos. V. Simons*,
00 Civ. 0967(NRB), 2000 U.S. Dist. LEXIS 3772 (S.D.N.Y. 2000)……………….…….22

*Grunstein v. Silva*,
C.A. No. 3932-VCN, 2009 Del. Ch. LEXIS 206 (Del. Ch. 2009) ………………….…18

*Halperin v. Moreno*,
Case No. 13-12783(KG),
2015 Bankr. LEXIS 2914 (Bankr. Ct. Del. Aug. 31 2015)…………………………...16, 17

*In re Hot Topic Sec. Litig.*,
CV 13-02939 SJO (JCx), 2014 U.S. Dist. LEXIS 180513 (C.D. Cal. May 2, 2014)……20

*Info. Superhighway., Inc. v. Talk Am., Inc.*,
274 F. Supp. 2d 466 (S.D.N.Y. 2003)……………………………………………………11

*Ivers v. Keene Corp.*,
780 F. Supp. 185 (S.D.N.Y. 1991)…………………………………………………19, 20

*Johnson v. Carlo Lizza & Sons Paving, Inc.*,
160 F. Supp. 3d 605, 617 (S.D.N.Y. 2016)……………………………………...23, 24

*Legal Aid Soc. v. City of N.Y.*,
114 F. Supp. 2d 204 (S.D.N.Y. 2000)……………………………………………...10, 11

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec. LLC*,
797 F.3d 160 (2d Cir. 2015)……………………………………………………………22

*McBeth v. Porges*,
171 F. Supp. 3d 216 (S.D.N.Y. 2016)………………………………………………………17

*Menaldi v. Pay-Per-View Network*,
97 Civ. 6451(HB), 1998 U.S. Dist. LEXIS 6378 (S.D.N.Y. 1998)………………………22

*Miller v. Greenwich Capital Fin. Prods.*,
2008 Bankr. LEXIS 3068 (Bankr. Ct. Del. 2008)…………………………………………...19

*In re Optim Energy, LLC*,
Case No. 14-10262(BLS), 2014 Bankr. LEXIS 2155*,
(Bank. Ct. Del. May 13, 2014)……………………………………………………………14

*PT China LLC v. PT Korea LLC*,
C.A. No. 4456-VCN, 2010 Del. Ch. LEXIS 38 (Del. Ch. 2010)…………………………18

iv

*Renco Grp., Inc. v. MacAndrews AMG Holdings LLC*,
   C.A. No. 7668-VCN, 2015 Del. Ch. LEXIS 25 (Del. Ch. 2015)…………………..…18

*Sabo v. Delman*,
   3 N.Y.2d 155 (1957)…………………………………………………………………...21

*Schuss v. Penfield Partners, L.P.*,
   Civ. Action No. 3132-VCP, 2008 Del. Ch. LEXIS 73 (Del. Ch. Jan. 10 2008)……..15, 19

*Siegel v. Ford*,
   No. 16-CV-8077(JPO), 2017 U.S. Dist. LEXIS 150147 (S.D.N.Y. Sept. 15 2017)…….22

*Singer v. Xipto Inc.*,
   852 F. Supp. 2d 416, 426 (S.D.N.Y. 2012)………………………………………………24

*St. John's Univ., N.Y. v. Bolton*,
   757 F. Supp. 2d 144 (E.D.N.Y. 2010). …………………………………………………..24

*Stanziale v. MILK072011, LLC*,
   548 B.R. 410, 413 (Bank. Ct. Del. 2015)…………………………………………17, 18

*Stanziale v. Versa Cap. Mgmt., LLC*,
   Case No. 14-10569(KG), 2017 Bankr. LEXIS 1506,
   (Bank. Ct. Del. June 1 2017)…………………………………………………………..14

*Sudul v. Computer Outsourcing Servs.*,
   868 F. Supp. 59 (S.D.N.Y. 1994)……………………………..………………………21

*Swartz v. Deutsche Bank*,
   No. C03-1252MJP, 2008 U.S. Dist. LEXIS 36139, (Dist. Wash. May 2, 2008)…….15, 16

*Tropical Sails Corp. v. Yext, Inc.*,
   No. 14 Civ 7582(JFK), 2015 US. Dist. LEXIS 64722, (S.D.N.Y. 2015)……………..23

*Wild Bunch, S.A. v. Vendian Entm't, LLC*,
   256 F. Supp. 3d 497 (S.D.N.Y. 2017)…………………………………………………22

Plaintiffs Seth Gerszberg ("Gerszberg") and EGRHC, LLC ("EGHRC") (together, "Plaintiffs") respectfully submit this Memorandum of Law in opposition to the motion to dismiss filed by Defendants Iconix Brand Group, Inc. ("Iconix"), IP Holdings Unltd., LLC ("IPHU") and Neil Cole ("Cole") (collectively, "Defendants") (ECF 17).  As detailed below, Defendants' motion (the "Motion") is meritless, and should be denied in its entirety, though if the Court for any reason should determine otherwise then Plaintiffs should be afforded the right to replead.

## PRELIMINARY STATEMENT

Plaintiffs' Complaint details a very disturbing and clearly actionable fact-pattern under which Defendants intentionally harmed Plaintiffs (and Plaintiffs' predecessor-in-interest) by engaging in knowing and intentional bad-faith, fraudulent and illegal misconduct in breach of Defendants' fiduciary, contractual and other legal obligations resulting in Plaintiffs having suffered tens of millions of dollars in damage.  It is essentially self-evident that Plaintiffs have sufficiently pled claims upon which relief may be granted, and each and every one of Defendants' more than 10 different arguments to the contrary is meritless.

## SUMMARY OF PLAINTIFFS' ALLEGATIONS [1]

### A.  The Parties

Gerszberg is one of the founding members of "MEE" (an acronym for "Marc Ecko Enterprises"), which was a group of affiliated companies that owned brands including ECKO UNLTD., MARC ECKO and ZOO YORK (the "MEE Brands") and operated associated businesses through wholesale, brick-and-mortar and e-commerce channels, and by way of third-

---

[1] On a motion to dismiss under Rule 12(b)(6), the Court must accept the Plaintiffs' factual allegations as true and draw all reasonable inferences in Plaintiffs' favor.  *Di Folco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010).  This summary includes references to external documents relied upon by Defendants in the Motion (an Operating Agreement and Buyout Agreement) to which Plaintiffs have no objection being considered.

party licensing arrangements.  (Compl. ¶¶ 24-27).  In October 2009, Gerszberg agreed to enter into a business transaction with Iconix, a public company engaged in "brand management" by which Iconix does not conduct operations in the form of manufacture and distribution activities, but instead "manages" brands through administration of licensing programs.  (Compl. ¶¶ 15-16, 28-34).  Cole served as Iconix's Chief Executive Officer, President and Chairman of the Board, and effectively controlled Iconix and its subsidiaries at all relevant times.  (Compl. ¶¶ 12-20, 33).

## B.  The 2009 Transaction

On October 26, 2009, a transaction closed by which, *inter alia*, (a) Iconix and a company owned by Gerszberg named Suchman, LLC ("Suchman") formed IPHU (owned 51% by Iconix and 49% by Suchman); (b) IPHU acquired global ownership of the MEE Brands and associated licensing agreements, including the right to receive all royalty streams in connection therewith; and (c) IPHU and a company owned by Gerszberg named 3TAC, LLC ("3TAC") entered into a master license agreement (the "MEE License") under which IPHU "licensed back" to 3TAC and its affiliated entities forming part of MEE (owned by Gerszberg) the rights to operate wholesale, brick-and-mortar and e-commerce businesses for the MEE Brands throughout the United States and most of the world.  (Compl. ¶¶ 35-43).  IPHU was party to dozens of license agreements from which it received royalties from the licensing of the MEE Brands but, of all such license agreements, the MEE License was far and away the most valuable and important to IPHU's business, among other reasons because (a) royalties payable to IPHU under the MEE License constituted nearly one-half of royalties payable by all of IPHU's licensees combined; and (b) under the MEE License, MEE was responsible for marketing, brand stewardship and other operational activities not just for MEE, but also for the benefit of all of IPHU's dozens of unaffiliated licensees around the world.  (Compl. ¶¶ 44-46).

2

In connection with IPHU's formation, the owners of IPHU (i.e., Iconix and Suchman) entered into a written operating agreement dated October 30, 2009 (the "Operating Agreement"). *See* Declaration of Defendants' counsel Simon Miller dated December 15, 2017 ("Miller Decl.", ECF 18), at Exh. B (ECF 18-2).  By the terms of the Operating Agreement, *inter alia*, (a) IPHU's profits were to be distributed between its members (Iconix and Suchman) subject to a sliding-scale formula that provided for Suchman's profits to rise or fall together with the rise or fall of total royalties collected by IPHU, inclusive of royalties paid under the MEE License; (b) Iconix was designated as the "Administrative Member" of IPHU, such that Iconix controlled the accounting, finance, legal and other back-off service functions for IPHU, including collection of royalties and associated audit and other enforcement efforts against IPHU's licensees; and (c) certain fiduciary duties of the company's members may have been limited but, importantly, were not eliminated.  (Compl. ¶ 37, and ECF 18-2 at § 11.06, quoted in Argument II.A below).

**C.  The Interconnectivities Between Plaintiffs, Defendants and the MEE License.**

The 2009 transaction created a structure by which the business, legal and economic relationships between Suchman and Iconix (as members of IPHU) and IPHU and MEE (as parties and beneficiaries under the MEE License) were interrelated and interdependent.  For example, (a) IPHU received revenues from its licensees, the most important of which was MEE, (b) Suchman, as a member of IPHU, received distributions from IPHU, and (c) Suchman used its distributions to fund MEE's operations and associated cash flow needs, including MEE's royalty payments to IPHU under the MEE License.  (Compl. ¶¶ 48-49).  To support the business relationship established in the 2009 transaction, Suchman loaned tens of millions of dollars to MEE to support MEE's operations and expenses in connection with the MEE License.  (Compl. ¶¶ 50-51).  Suchman extended that loan in reliance upon its reasonable expectation that Iconix

and Cole would act in good faith, in compliance with the letter and spirit of the IPHU Operating Agreement, and in a manner consistent with their fiduciary duties owed to IPHU and Suchman with respect to administration and operation of IPHU's business, including in particular its relationships with 3TAC and MEE under the MEE License.  (Compl. ¶¶ 51-53).

**D.  Defendants' Bad-Faith Malicious Activities.**

Cole developed a hatred of Gerszberg and undertook a malicious campaign, implemented through Iconix and IPHU, to drive Gerszberg and Suchman into financial ruin and bankruptcy. Towards that end, Defendants individually and collectively committed a series of intentionally injurious, subversive and wrongful acts targeted against Suchman, which included a series of intentionally injurious, subversive and wrongful acts targeted against MEE under the MEE License.  Indeed, Defendants knowingly and intentionally caused harm to Suchman by targeting 3TAC, MEE and the MEE License because Defendants knew that doing so would financially cripple Suchman (because, the success, failure and profitability of the MEE License materially impacted the success, failure and profitability of all of IPHU's revenue streams, and hence impacted distributions payable to Suchman, and also affected MEE's ability to repay the tens of millions of dollars that had been loaned by Suchman to MEE) and that in turn would force Gerszberg to sell Suchman's ownership interest in IPHU to Iconix.  Defendants thereby engaged in a knowing, intentional, bad-faith and malicious "squeeze-out" and "cram-down" designed to harm and financially cripple Gerszberg and his businesses (including Suchman) as a means to force Suchman to sell its shares in IPHU to Iconix.  (Compl. ¶¶ 54-61).

**E.  Fraudulent Inducement**

Defendants made materially false representations to Gerszberg and Suchman in order to fraudulently induce them to enter into a transaction by which Suchman would sell its shares in

IPHU to Iconix.  Gerszberg and Suchman reasonably relied on those false representations and it was only on that basis that Suchman sold its shares in IPHU to Iconix.  (Compl. ¶¶ 62-81).

More particularly, the reason that Gerszberg and Suchman agreed that Suchman would sell its shares in IPHU to Iconix was because Defendants threatened that, in the absence of such a sale, Defendants would immediately terminate the MEE License, and do so without affording MEE any "sell-off period" (which in turn would have had the effect of forcing Gerszberg and all of his businesses into immediate bankruptcy).  Moreover, as explained above, and as more fully detailed in the Complaint, any such or other action targeted against the MEE License would have caused material financial harm to IPHU, and hence to Suchman.  (*Id.*)

Gerszberg and Suchman for a period of time did not believe those threats, because the MEE License was IPHU's most valuable and critical asset which Defendants should have had rational motivations and fiduciary obligations to preserve.  IPHU needed the MEE License to preserve IPHU's value, and Gerszberg and Suchman therefore reasonably believed that, despite Defendants threats, Defendants never would actually terminate the MEE License without having a reasonably acceptable alternative go-forward business model in place for IPHU, of which there was none.  Put another way, absent Defendants having an alternative business model in place for IPHU (of which there was none), Defendants threats to terminate the MEE License were reasonably interpreted as just that – empty threats – and those empty threats were insufficient to force Gerszberg and Suchman to sell Suchman's shares in IPHU to Iconix.  (*Id.*)

Defendants recognized that they had to give some form of credibility to their threats, so they knowingly made materially false representations to Gerszberg and Suchman.  Defendants made false representations concerning their discussions and plans to replace MEE with an alternative licensee, false representations concerning discussions between Defendants and third-

5

party wholesale outlets such as J.C. Penney's, and false representations concerning go-forward revenue streams with successor licensees that Defendants claimed would follow following a termination of the MEE License.  These misrepresentations caused Gerszberg and Suchman to sell Suchman's equity interest in IPHU to Iconix, and also caused them to accept consideration in the form of a perpetual royalty stream which they would not otherwise have agreed upon.  (*Id.*)

**F.  The 2013 Transactions**

Based on Defendants' material false representations, Gerszberg, Suchman and 3TAC were fraudulently induced to enter into transaction (the "2013 Transactions") pursuant to which, *inter alia*, (a) Gerszberg, Suchman, Iconix and IPHU executed a buyout agreement (the "Buyout Agreement") pursuant to which, *inter alia*, Suchman sold its 49% equity interest in IPHU to Iconix for (on paper) $45 Million in cash plus entitlement to a 10% perpetual royalty stream (the "Perpetual Royalty Stream"); and (b) IPHU and 3TAC entered into a Fourth Amendment to the MEE License pursuant to which 3TAC received an extension of its license through September 30, 2015.  (Compl. ¶¶ 69-81); *see* Buyout Agreement (formally titled "Membership Interest Purchase Agreement") at Miller Decl. Exh. C.

The Buyout Agreement (at §5.2) contained a limited release (the "Limited Release"), by which Gerszberg and Suchman released Defendants from claims arising from the Operating Agreement and/or IPHU's prior operations, but which had an express carve-out exempting from the release claims arising from the MEE License.  (Compl. ¶¶73, 75; Argument I below).

The Buyout Agreement also contained representations by IPHU and Iconix that they were not in violation (and had not been given written notice) of any violation of law, and that there were no investigations, proceedings or reviews pending.  (Compl. ¶ 74).

6

Even after entry into the Buyout Agreement, Defendants continued their malicious campaign against Gerszberg and his businesses, including by refusing to honor any of the terms of the Perpetual Royalty Stream.  (*Id*. at ¶¶ 95-97, 102-113).

## G.  Defendants' Fraudulent Accounting and Securities Fraud

Although Plaintiffs did not know it at the time of the 2009 Transaction or the 2013 Transactions, Iconix and Cole had a long history of engaging in improper and fraudulent accounting practices to manipulate Iconix's earnings and revenues so as to artificially inflate Iconix's stock price.  This included without limitation Defendants' practice of "round-tripping", by which Defendants would covertly structure business dealings so as to secretly "round-trip" funds from one or more Defendants to one or more third-parties, only to funnel the funds back to Defendants under the guise of legitimate revenue, so as to fraudulently inflate publicly disclosed earnings.  (Compl. ¶¶ 82-94).  Indeed, though Plaintiffs did not know it at the time, Defendants forced Gerszberg and Suchman to sell Suchman's equity interest in IPHU to Iconix for purposes of enabling Defendants to engage in illegal conduct in the form of further "round-tripping", including because Defendants could not effectuate their illicit scheme with Suchman as a co-owner of the business.  Neither Gerszberg nor Suchman would have entered into the 2013 Transactions had they known this information.  (*Id*. and Compl. ¶ 90-94).

## ARGUMENT

## I.  PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE LIMITED RELEASE

Defendants argue that the Limited Release bars Plaintiffs' First, Second, Fourth and Fifth Causes of Action (Motion Arg. I, II.A, III, IV.A and V), but Defendants' argument is meritless because (a) the Limited Release includes an express carve-out under which each such cause of action falls outside the scope of the release (and, to the extent Defendants intend to dispute the

7

intent and scope of the release, they create a fact dispute which cannot be decided against Plaintiffs on this pre-answer Motion to Dismiss) (Point I.A below); and (b) in all events, the Limited Release is void because it was induced by Defendants' fraud (Point I.B below).

## A.  **Plaintiffs' Claims Are Outside Of The Scope of the Limited Release.**

The Limited Release is just that:  a *limited release*, and not a general release.  This is because it is expressly limited in scope to certain subject matter, and even then has an express carve-out from its scope.  More specifically, the Limited Release releases claims solely:

> ". . . to the extent relating to or arising from the Operating Agreement (including without limitation Iconix's performance and/or non-performance of its obligations with respect to IPHU) and/or to the extent relating to or arising from IPHU's business, operations, assets, liabilities and/or Contracts (including without limitation any Third Party License Agreements, but excluding the MEE License Agreement) to which IPHU at any time was and/or is a party, from the beginning of time through and including the date of this Agreement."  Miller Decl. Exh. C (Buyout Agreement) at §5.2 (emphases added).

The underlined language above forms the express predicate by which Plaintiffs' First, Second, Fourth and Fifth Causes of Action are allowed to proceed, even in the absence of fraudulent inducement.  Indeed, Plaintiffs expressly pled the existence of the Limited Release, under which Gerszberg and Suchman released the Defendants from certain claims relating to IPHU as it had existed and operated from October 2009 through May 2013, except to the extent such claims related to or arose from the MEE License:

> "In the Buyout Agreement's mutual release provision, Suchman agreed to release Defendants from claims relating to the IPHU Operating Agreement and/or to IPHU's business activities to the extent such claims did not relate to the MEE License Agreement. (Claims relating to the MEE License Agreement were expressly carved out of both mutual releases.)"  (Compl. ¶ 73).

Plaintiffs clearly pled that the Limited Release expressly carved out from its scope any and all claims which Gerszberg and/or Suchman had against the Defendants relating to or arising from the MEE License.  On that basis, Plaintiffs' claims are <u>not</u> barred by the Limited Release because they are claims of Gerszberg (directly and/or as Suchman's successor-in-interest) against the Defendants to the extent relating to or arising from <u>wrongful acts of Defendants taken with respect to the MEE License</u> which caused harm to Gerszberg and/or Suchman.

For even further clarity, the release carveout was negotiated and agreed in recognition of the fact that some – but not all – <u>claims of Gerszberg and/or Suchman</u> against the Defendants related to MEE License, which caused harm <u>to Gerszberg and/or Suchman</u> based on the interconnectivities between Suchman, IPHU and the MEE License.  (*See* Section C of Summary of Plaintiffs' Allegations above).  That subcategory of claims was expressly carved out from the scope of the Limited Release to preserve such claims, and are the claims on which Plaintiffs now sue.  References throughout the Complaint to the MEE License show the manner by which Defendants intentionally caused harm to Gerszberg and Suchman as it related to fiduciary, contractual and/or other obligations owed by Defendants to Gerszberg and Suchman in connection with ownership and operation of IPHU.  (Compl. ¶¶ 48-61).

Defendants therefore mischaracterize the issue when they drop a footnote (fn. 2 at Motion p.2) arguing that "Plaintiffs' attempt to assert a breach of the MEE License Agreement." Plaintiffs have not asserted claims for breach of the MEE License, nor could they as neither they (nor Suchman as Gerszberg's predecessor-in-interest) were parties to the MEE License (the licensee under that agreement was 3TAC).  To the contrary, Plaintiffs' claims asserted herein are <u>claims of Gerszberg and/or Suchman</u> (not 3TAC) against the Defendants that related to or arose from wrongful acts of Defendants <u>against Plaintiffs (and/or Suchman)</u> which targeted them by

way of devaluing and destroying the MEE License, and which in turn caused harm to Gerszberg and/or Suchman based on the interconnectivities between the Plaintiffs (including Suchman as Gerszberg's predecessor-in-interest), Defendants and the MEE License.  (Compl. ¶¶ 48-61).

Defendants themselves make a critical (and likely inadvertent) concession in their moving papers, when they themselves claim that "many, if not all, of the Complaint's allegations in this Claim relate to the MEE License Agreement."  (Motion Arg. III, at 16; emphasis added). Plaintiffs do not dispute this and, explained above, this was intentionally so because such allegations thereby fall outside the scope of the Limited Release.

Defendants at all times were well-aware of the carve-outs in the Limited Release (indeed, they not only negotiated and agreed to them, but the carve-outs were expressly referenced in Plaintiffs' Complaint, ¶ 73).  Yet having no good-faith substantive response to address the point, Defendants instead sought to hide from and bury the issue in a single footnote without discussion:  they claim that "Neither Suchman nor Gerszberg were a party to the MEE License Agreement so the carve-out is inapplicable to this action."  (Motion, fn. 11).  Defendants argument is meritless.  The Limited Release, together with its carve-outs, are in the Buyout Agreement.  The only parties to the Buyout Agreement are Gerszberg, Suchman, Iconix and IPHU; 3TAC and MEE are not parties to the Buyout Agreement.  *Id.*  The manner by which Defendants read the carve-out (by claiming it can only be relied on by an entity affiliated with Gerszberg which was a party to the Buyout Agreement and which was also a party to the MEE License) makes no sense because there never was any such entity, and Defendants' argument would thereby render the express carve-out forming the predicate for the Limited Release a non-sensical nullity.  *See, e.g.*, *Legal Aid Soc. v. City of N.Y.*, 114 F. Supp. 2d 204, 229 (S.D.N.Y.

10

2000) ("[B]asic principles of contract interpretation militate against the adoption of an interpretation that would render any portion of the contract language a nullity") (citing cases).

Defendants contend that "it is clear that when the parties entered into the Buyout Agreement in May 2013, they intended to release each other from *all* claims that may have existed at that time". (Motion, at 9). As set forth above, <u>Plaintiffs pled facts to the contrary</u> (Compl. ¶ 73), <u>Plaintiffs dispute Defendants' factual contention</u>, and <u>language in the Buyout Agreement belies Defendants' factual contention</u>. To the extent Defendants dispute the intent and scope of the Limited Release, they only create a fact dispute which cannot be decided against Plaintiffs on this pre-answer Motion to Dismiss. *See, e.g.*, *Info. Superhighway., Inc. v. Talk Am., Inc.*, 274 F. Supp. 2d 466, 470 (S.D.N.Y. 2003) ("A release is a form of contract and 'is governed by principles of contract law' . . . Where a contract is ambiguous, it cannot be decided as a matter of law on a motion to dismiss. . . Moreover, because the 'law looks with disfavor upon agreements intended to absolve [a party] from the consequences of his [wrongdoing],' a release which purports to excuse a party from responsibility for misconduct is subject to the 'closest of judicial scrutiny.' . . . Under this standard of scrutiny, therefore, an ambiguous release may not form the basis for a motion to dismiss.") (internal citations omitted).

For the reasons above, Plaintiffs' claims are outside the scope of the Limited Release (and, to the extent Defendants intend to dispute the intent and scope of the release, they create a fact dispute which cannot be decided against Plaintiffs on this pre-answer Motion to Dismiss).

**B.  In Any Event, the Limited Release is Null and Void Because it was Fraudulently Induced.**

Putting aside all issues concerning the scope of the Limited Release (Argument I.A above), the Limited Release is null and void in its entirety because it was fraudulently induced. *See Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276

11

(2011):  "A plaintiff seeking to invalidate a release due to fraudulent inducement must establish the basic elements of fraud, namely a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by plaintiff, and resulting injury".  Plaintiffs sufficiently pled all such elements.  *See* Section E of Summary of Plaintiffs' Allegations above, and Compl. ¶¶ 62-81.

Defendants correctly point out that the Limited Release is void only if Plaintiffs can allege a "separate fraud from the subject of the release".  (Motion Arg. IV.A)  This rule ensures that one cannot purport to release a fraud claim only to turn around and claim that such release should be deemed void based on the very fraud that such release purported to release in the first place.  *Centro Empresarial Cempresa*, 17 N.Y.3d at 276 ("Were this not the case, no party could ever settle a fraud claim with any finality.").

In this case, Plaintiffs' allegations of fraud which form the predicates of their fraudulent inducement claim are separate and distinguishable from the scope of fraud purportedly released by the Limited Release.  The Limited Release purported to release fraud claims arising from then-past operation of IPHU (except to the extent arising from the MEE License), which stands in marked contrast to Plaintiffs' fraudulent inducement claim which is predicated upon fraudulent misrepresentations (a) concerning Defendants' future plans for operation of IPHU (as opposed to past operations covered by the Limited Release); (b) the MEE License (a subject carved out from the scope of the Limited Release); and (c) the Defendants' concealment of illegal activities which rendered the entire negotiation surrounding the Buyout Agreement as a sham.  (*See* Sections E-G of Summary of Plaintiffs' Allegations above).

Defendants evidently recognize the above-noted separateness between the allegations underling Plaintiffs' fraudulent inducement claim and the scope of fraud purportedly released by

12

the Limited Release:  indeed, this could be inferred from the fact that Defendants quote the Limited Release in a very misleading way to support their argument to the contrary:  *see* Motion at p.17 in which Defendants quote an unreasonably limited portion of the Limited Release in a manner which falsely implies the Limited Release to have been a general release, and ignoring all references to the express limitations and carve-outs in the Limited Release which made clear that the Limited Release only applied to matters relating to past operation of IPHU with a carve-out for matters relating to the MEE License.  If and to the extent Defendants raise any valid argument in this respect (and they do not), they have done nothing more than create a fact dispute which cannot support the basis for their Motion to Dismiss.  *See, e.g.*, *Board of Mgrs. of 325 Fifth Ave. Condo. v. Continental Residential Holdings LLC*, Case No. 154764/12, 2016 N.Y. Misc. LEXIS 2423, at *8-9 (N.Y. Cty. June 27, 2016) ("Although a signed, clear, and unambiguous release between sophisticated and counseled parties is binding and should never be converted into a starting point ... for litigation, whether in fact there are grounds, such as whether the release itself was induced by a separate fraud, is a matter that cannot be safely decided simply on a pleading motion, but requires a further exploration of the facts, whether by way of summary judgment or trial.") (citations omitted).

## II.  PLAINTIFFS STATED A CLAIM FOR BREACH OF FIDUCAIRY DUTY AND AIDING AND ABETTING

As set forth below, Defendants' arguments asserted against Plaintiffs' First Cause of Action (Breach of Fiduciary Duty / Aiding and Abetting Breach of Fiduciary Duty) are meritless.

### A.  <u>IPHU's Operating Agreement Did Not Eliminate Fiduciary Duties</u>.

Defendants claim that Delaware law governs and permits members of a limited liability company to contractually expand, restrict or eliminate fiduciary duties, except may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied

contractual covenant of good faith and fair dealing.  (Motion Arg. II.B.).  Defendants

erroneously claim that this law supports dismissal of Plaintiffs' breach of fiduciary claim.

      Defendants fail to explain that Delaware law provides that drafters of an operating

agreement "must make their intent to eliminate fiduciary duties 'plain and unambiguous'".  *See*

*e.g.*, *Stanziale v. Versa Cap. Mgmt., LLC*, Case No. 14-10569(KG), 2017 Bankr. LEXIS 1506, at

*13 (Bank. Ct. Del. June 1 2017), *citing Bay Ctr. Apts., Owner, LLC v. Emery Bay PKI, LLC*,

C.A. No. 3658-VCS, 2009 Del. Ch. LEXIS 54, at *9 (Del. Ch. Jan. 30, 2015).  An example of

such plain and unambiguous language is quoted in *In re Optim Energy, LLC*, Case No. 14-

10262(BLS), 2014 Bankr. LEXIS 2155*, at *19 (Bank. Ct. Del. May 13, 2014) where the

operating agreement provided that "the Members specifically intend that no Director or Member

shall have any fiduciary duties to the Company, any Member or any other party".

      There is no such or other language in the Operating Agreement that *eliminates* fiduciary

duties, much less in a plain and unambiguous manner.  Rather, what the Defendants rely on is a

provision of the Operating Agreement (Section 11.06(a)) which *limits* (rather than eliminates)

fiduciary duties of members and managers to performance "(i) in a manner he believes in good

faith to represent the care an ordinarily prudent person in a like position would exercise under

similar circumstances; (ii) in good faith reliance on the provisions of this Agreement;

(iii) without intentional misconduct or a knowing violation of law; and (iv) without engaging in

any transaction for which he receives a personal benefit in violation or breach of any provision of

this Agreement".  (Operating Agreement at 53-54).  That very same provision of the Operating

Agreement (§11.06(a)) then goes on to provide that "[e]xcept as explicitly set forth above or

otherwise in this Agreement, no Manager or Officer has any other duty to the Company, any

Member or any Person" (emphasis added), with that underlined language thereby making clear

that Section 11.06(a) expressly provides for the existence of fiduciary duties, without "any other duty" to be implied.  *Id.*  Still further, Section 5.12(a) of the Operating Agreement references indemnification for breach of fiduciary duties, thereby recognizing preservation of same.

Plaintiffs' breach of fiduciary claim falls squarely within the scope of fiduciary duties expressly preserved by the Operating Agreement, as predicated on allegations of bad faith, intentional misconduct and knowing violations of law.  A breach of fiduciary claim clearly may proceed under this circumstance.  *See, e.g.*, *Freeley v. NHAOCG, LLC*, 62 A.3d 649, 664 (Del. Ch. 2012) (refusing to dismiss breach of fiduciary claim where LLC agreement referenced duties arising from acts or omissions of gross negligence, willful misconduct or fraud, including because "Willful misconduct is one standard for evaluating whether a fiduciary breached the duty of loyalty by acting in bad faith". . . if the operating agreement "had eliminated fiduciary duties, as [argued], then it would be counter-intuitive for the same provision to recognize exceptions to exculpation for gross negligence and willful misconduct and to authorize the managing member to obtain insurance against actual or alleged breaches of fiduciary duty and require [the company] to pay the premiums"; *see also* Operating Agreement at §5.12(a): similarly requiring IPHU to indemnify breach of fiduciary duty claims); *Burtch v. Opus, LLC*, 528 B.R. 30, 67-68 (Bank. Ct. Del. 2015) (provision of operating agreement which prohibits "bad faith" supports a breach of fiduciary duty claim); *Schuss v. Penfield Partners, L.P.*, Civ. Action No. 3132-VCP, 2008 Del. Ch. LEXIS 73, at *32-33 (Del. Ch. Jan. 10 2008) (refusing to dismiss breach of fiduciary claim because "[a]lthough this is a broad exculpation clause, the limitation of liability, by its terms, does not cover gross negligence, willful misconduct, or violation of applicable laws"); *Swartz v. Deutsche Bank*, No. C03-1252MJP, 2008 U.S. Dist. LEXIS 36139, at *47-49 (Dist. Wash. May 2, 2008) (applying Delaware law:  an operating

15

agreement cannot disclaim a fiduciary relationship in contravention of implied covenant of good faith and fair dealing and/or when a member engages in illegal activity).

As set forth above, fiduciary duties were not eliminated by the Operating Agreement.  If any doubt, Defendants merely raise a factual dispute which lends no support to its Motion.  *See, e.g.*, *Bay Ctr. Apts., Owner, LLC*, 2009 Del. Ch. LEXIS 54 at *29-30 (refusing to dismiss claim in context of dispute whether or not operating agreement eliminated fiduciary duty because "On a motion to dismiss, the court cannot choose between reasonable interpretations of ambiguous contract provisions.  Instead, defendants are only entitled to dismissal if the interpretation of the contract on which their theory of the case rests is the *'only* reasonable construction as a matter of law.  The determinative question is therefore whether the defendants' position that the LLC Agreement eliminates their fiduciary duties is the *only* reasonable one. I find that it is not.").

**B.  Plaintiffs' Breach of Fiduciary Duty Claim Is Not Duplicative.**

For the reasons below, there is no merit to Defendants' argument that Plaintiffs' breach of fiduciary claim should be dismissed as duplicative of Plaintiffs' claim for breach of the Operating Agreement.  (Motion Arg. II.C).

(1) Cole Is Not A Party to IPHU's Operating Agreement.

Cole is not a party to the Operating Agreement, so Defendants' argument concerning duplication of claims cannot apply to him personally.  *See, e.g.*, *2009 Caiola Family Trust v. PWA, LLC*, C.A. No. 8028-VCP,  2014 Del. Ch. LEXIS 261, at *29 (Del. Ch. Dec. 18, 2014) ("While some of the factual allegations supporting Plaintiffs' breach of fiduciary duty claims overlap with those related to their breach of contract claims . . . Katz is not a party to the Operating Agreement, so the alleged wrongdoing attributable to him cannot be coextensive with Plaintiffs' breach of contract claim."); *Halperin v. Moreno*, Case No. 13-12783(KG), 2015

Bankr. LEXIS 2914, at * 38 (Bankr. Ct. Del. Aug. 31 2015) (breach of fiduciary duty against an individual could not be duplicative of breach of contract claim where the individual signed the contract on behalf of parties involved but was not himself a party to the contract).

    (2) Plaintiffs' Claim Arises Independently From General Fiduciary Principles
        Rather Than From Specific Contractual Obligations.

      Further, Plaintiffs breach of fiduciary duty claim is not duplicative of their breach of contract claim against *any* Defendant because the breach of fiduciary duty claim arises from general fiduciary principles rather than specific contractual obligations. *See, e.g.*, *Halperin*, 2015 Bankr. LEXIS 2914, at * 38 ("In determining whether a breach of fiduciary duty claim is duplicative of a corresponding breach of contract claim, the principal inquiry by Delaware courts is whether the fiduciary duty in the complaint arises from general fiduciary principles or from specific contractual obligations agreed upon by the parties. . . . Put simply, [t]he issue is whether the duty sought to be enforced arises out of the parties' contractual, as opposed to their fiduciary, relationship.") (internal quotation and citation omitted); *McBeth v. Porges*, 171 F. Supp. 3d 216, 232 (S.D.N.Y. 2016) ("Although the same facts underlie both claims, 'the appropriate question' under Delaware law is not whether the claims arise from the same facts, but rather whether there exists an independent basis for the fiduciary duty claims apart from the contractual claims.").

      Plaintiffs breach of fiduciary duty claims are not predicated on specific contractual provisions which Plaintiffs claim to have been breached:  e.g., no provision in the Operating Agreement expressly prohibits destruction of the MEE License, or addressed the myriad of misconduct alleged in the Complaint (¶¶54-61), or prohibited a "squeeze-out" and "cramdown" of Suchman's ownership rights.  The violations are instead predicated upon breaches of fiduciary duty (inclusive of duties of care, fairness, honesty and loyalty) derived directly from Delaware law, and not merely created by express contractual obligation. *See, e.g.*, *Stanziale v.*

*MILK072011, LLC*, 548 B.R. 410, 413 (Bank. Ct. Del. 2015) ("Delaware law has long recognized that directors – or in the case of a limited liability company – its controlling owner, manager and President – owe a fiduciary duty to the company they serve.  A breach of the duty of loyalty may be found when the fiduciary has failed to act in good faith."); *PT China LLC v. PT Korea LLC*, C.A. No. 4456-VCN, 2010 Del. Ch. LEXIS 38, at *26 (Del. Ch. 2010) ("[Defendant] argues that the 'key issue' is whether the fiduciary and contractual claims are based on the same facts.  The case law, however, does not support this reading – the appropriate question instead is whether there exists an independent basis for the fiduciary claims apart from the contractual claims, even if both are related to the same or similar conduct").

That Plaintiffs' breach of fiduciary claims arise from general fiduciary principles rather than specific contractual provisions readily distinguishes this case from those cited by Defendants:  *Renco Grp., Inc. v. MacAndrews AMG Holdings LLC*, C.A. No. 7668-VCN, 2015 Del. Ch. LEXIS 25, *25 (Del. Ch. 2015) (finding duplication only because the "purported violations correspond to contractual provisions that Plaintiff cites extensively in its complaint"); *Grayson v. Imag. Stn., Inc.*, C.A. No. 5051-CC, 2010 Del. Ch. LEXIS 169, at *22-27 (Del. Ch. 2010) (same:  no breach of fiduciary claim would have existed independent of expressly stated contractual obligations); *Grunstein v. Silva*, C.A. No. 3932-VCN, 2009 Del. Ch. LEXIS 206, at *17 (Del. Ch. 2009) (same: "In determining whether a breach of fiduciary duty claim is duplicative of a corresponding breach of contract claim, the principal inquiry by Delaware courts is whether the fiduciary duty in the complaint arises from general fiduciary principles <u>or from specific contractual obligations agreed upon by the parties</u>") (emphasis added).

The law is equally clear that a party may assert breach of fiduciary duty claims together with a breach of contract claim where the fiduciary claims "depend on additional facts . . . are

broader in scope, and involve different considerations in terms of a potential remedy." *Schuss*, 2008 Del. Ch. LEXIS 73, at \*35. All such tests are satisfied here, including because Plaintiffs' claim arises from general fiduciary principles dependent on facts beyond the scope of contractual obligations, and because Plaintiffs seek rescission, accounting and other equitable remedies in connection with the claim, as well as punitive damages, all the foregoing involving different considerations in terms of a potential remedy than would Plaintiffs' breach of contract claim.

Finally, in all events, Plaintiffs have the right to plead in the alternative. *Miller v. Greenwich Capital Fin. Prods.*, 2008 Bankr. LEXIS 3068, at \*10 (Bankr. Ct. Del. 2008) (denying motion to dismiss breach of fiduciary duty as duplicative of breach of contract claim because "[e]ven if this were so, it is not a basis for dismissing that count. A party may plead alternative claims for relief based on the same facts alleged. Fed. R. Civ. P. 8(d)(2).").

## C. IPHU Can Be Held Liable for Aiding and Abetting its Affiliated Entities.

Defendants erroneously argue that Plaintiffs' aiding and abetting claim against IPHU should be dismissed because IPHU was controlled by its co-defendants. (Motion Arg. II.D). To the contrary, both Delaware and New York law make clear that any entity may be held liable for aiding, abetting and conspiring with its affiliated entities irrespective of common control. *See, e.g.*, *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1039 (Del. Ch. 2006) ("this state's [i.e., Delaware's] acceptance of claims for aiding and abetting breaches of fiduciary duty brought against parent corporations and their affiliates, including subsidiaries, belies any outright rejection of the proposition that wholly-owned and/or commonly-controlled entities cannot be held responsible for each other's acts when those acts result from concerted unlawful activity."); *Ivers v. Keene Corp.*, 780 F. Supp. 185 (S.D.N.Y. 1991) (complaint stated claim for aider and abettor liability against a subsidiary and its CEO that aided and abetted the parent company).

19

Defendants cite just one case in support of its argument – a California case: *In re Hot Topic Sec. Litig.*, CV 13-02939 SJO (JCx), 2014 U.S. Dist. LEXIS 180513, *47 (C.D. Cal. May 2, 2014).  The case is readily distinguishable because it discusses inapplicable California law on the question whether a corporation can be liable for aiding and abetting its director (a different question from whether an entity can be liable for aiding, abetting and conspiring with a commonly controlled affiliate).  Defendants' argument is not only unsupported by governing law, but runs contrary to clear public policy recognizing separateness of corporate entities.

**III. PLAINTIFFS STATED A CLAIM FOR BREACH OF OPERATING AGREEMENT**

Defendants next argue that Plaintiffs failed to state a claim for breach of the Operating Agreement because Plaintiffs' allegations relate to a separate contract (the MEE License), for which there is lack of contractual privity.  (Motion Arg. III).  Defendants' argument is a 'strawman argument', and completely meritless, because Plaintiffs <u>do not</u> assert breach of contract claims under that separate contract, but rather reference that contract to make clear how and why Plaintiffs' claims fall outside the scope of the Limited Release, and because the MEE License is relevant to damages sustained by Plaintiffs by virtue of Defendants' material breaches of the Operating Agreement for which there is contractual privity.  *See* Argument I.A above.

**IV. PLAINTIFFS STATED A CLAIM FOR FRAUDULENT INDUCMENT**

Plaintiffs refer the Court to Section E of Summary of Plaintiffs' Allegations (above), where Plaintiffs summarize their fraudulent inducement claim in narrative form, with citations. Defendants' argument that Plaintiffs failed to state a claim (Motion Arg. IV) is meritless.

**A.  <u>Promises Made With Intentions Not to Perform Constitute Actionable Misrepresentations.</u>**

Defendants purport to cite *EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 233 (S.D.N.Y. 2012) for the "general rule" that "a promissory statement of what will be done in the

future gives rise only to a breach of contract cause of action and a misrepresentation of a present fact gives rise to a separate cause of action for fraudulent inducement."  (Motion p. 19).

Defendants' argument fails with respect to fact.  Plaintiffs' fraudulent inducement claim is <u>not</u> solely based on a promissory statement of what was to be done in the future as Defendants claim.  Rather, Plaintiffs' claim includes allegations that Defendants knowingly made materially false representations to Gerszberg and Suchman regarding (a) business discussions Defendants purported to have had with wholesale outlets, (b) a go-forward licensing deal Defendants purportedly had arranged with a successor licensee to replace MEE; (c) Defendants then-existing business plans; (d) then-existing revenue projections; and (e) Defendants' illegal accounting practices.  *See* Summary of Plaintiffs' Allegations, at Section E *infra*; Compl. ¶¶62-81; 131-147.

Defendants' argument independently fails as a matter of law.  While Defendants cite *EQT Infrastructure Ltd.* for a "general rule", they fail to cite the exception by which Plaintiffs' claim, even if predicated on future promises, is not barred:  "The exception to this rule, however, as explained by the New York Court of Appeals in *Sabo v. Delman*, 3 N.Y.2d 155 (1957), and *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403.(1958), is that where a complaint alleges that 'a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of a material existing fact.'", *citing Sudul v. Computer Outsourcing Servs.*, 868 F. Supp. 59, 62 (S.D.N.Y. 1994) ("New York's Court of Appeals has held that a contracting party can be held liable for fraud when, at the time he made a promise, he did not intend to keep it."). *EQT Infrastructure*, 861 F.Supp. 2d at 233-34.

**B.  <u>Plaintiffs Sufficiently Alleged Reasonable Reliance</u>.**

Also without any merit is Defendants' argument that Plaintiffs failed to sufficiently allege justifiable reliance.  (Motion Arg. IV.B.1).  To the contrary, Plaintiffs specifically alleged

reasonable reliance (Compl. ¶¶69-70, 140-144), and Defendants' argument thereby does nothing more than raise a fact dispute that cannot support their pre-answer motion to dismiss. *See, e.g.*, *Wild Bunch, S.A. v. Vendian Entm't, LLC*, 256 F. Supp. 3d 497, 507 (S.D.N.Y. 2017) ("dismissals for failure to allege reasonable reliance are heavily disfavored. As the Second Circuit has explained, 'the reasonableness of a plaintiff's reliance is a 'nettlesome' and 'fact-intensive' question which we, like our Circuit's many district courts, will not lightly dispose of at the motion-to-dismiss stage"), *citing Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec. LLC*, 797 F.3d 160, 186 n.19 (2d Cir. 2015); *Siegel v. Ford*, No. 16-CV-8077(JPO), 2017 U.S. Dist. LEXIS 150147, at *25-26 (S.D.N.Y. Sept. 15 2017) ("Under New York's contextual approach, 'the question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive. Reasonable reliance is therefore a question normally reserved for the finder of fact and not usually amenable to summary judgment") (citations omitted).

Defendants' references to contract boilerplate does nothing to foreclose the fact-intensive nature of Defendants' challenge. Their reference to certain language in the Operating Agreement is clearly off-point, including because that agreement was entered into years prior to the alleged fraudulent inducement here at issue. Their reference to an "As Is" clause is unavailing because that clause constitutes a disclaimer protective of Suchman's interest (and not of the Defendants' representations) in the context of the conveyance of equity. Relatedly, Defendants' reference to an integration clause in the Buyout Agreement is unavailing, because New York law makes clear that "[t]he presence of an integration clause in the Agreement does not preclude the introduction of parol evidence on the issue of fraudulent inducement". *Great Earth Cos. V. Simons*, 00 Civ. 0967(NRB)., 2000 U.S. Dist. LEXIS 3772, at n.3 (S.D.N.Y. 2000); *Menaldi v. Pay-Per-View*

*Network*, 97 Civ. 6451(HB), 1998 U.S. Dist. LEXIS 6378, at *5 (S.D.N.Y. 1998) (a "general

integration clause such as the one here does not normally bar claims of fraudulent inducement").

## V.   PLAINTIFFS' UNJUST ENRICHMENT CLAIM IS NOT DUPLICATIVE.

Defendants argue that Plaintiffs' unjust enrichment claim should be barred as duplicative

of a contract claim (Motion Arg. V) but, as set forth below, the argument is meritless.

### A.   Cole Is Not a Party to Any of the Underlying Contracts.

First, Cole is not a party to the Buyout Agreement, so Defendants' argument concerning

duplication of claims cannot possibly apply to him personally.

### B.   Plaintiffs' Unjust Enrichment Claims Are Predicated on Conduct Not Covered by Contract and Otherwise Stem From Defendants' Misrepresentations and Fraud.

"Generally, an unjust enrichment claim is not available where it simply duplicates, or

replaces, a conventional contract or tort claim.  New York courts have, however, permitted an

exception to this rule, such that a claim for unjust enrichment is not duplicative of a breach of

contract claim where the plaintiff alleges that the contracts were induced by fraud." *Tropical*

*Sails Corp. v. Yext, Inc.*, No. 14 Civ. 7582(JFK), 2015 US. Dist. LEXIS 64722, at *18 (S.D.N.Y.

2015) (refusing to dismiss unjust enrichment claim as duplicative of breach of contract claim

where plaintiff alleged the agreement induced by fraud); *Allstate Ins. Co. v. Lyons*, 843 F. Supp.

2d 358, 376 (E.D.N.Y. 2012) (same; refusing to dismiss unjust enrichment claims because they

were premised on alleged misrepresentations "not covered by the contract").  Accordingly,

Plaintiffs are entitled to proceed on their unjust enrichment against *all* Defendants because they

are premised on Defendants' alleged fraudulent misrepresentations.  *See, e.g.*, Compl. ¶177.

### C.   Plaintiffs Have a Right to Plead Claims in the Alternative.

In all events, while a plaintiff may not recover on a quasi-contract theory if a contract

governs, at the pleading stage a plaintiff may proceed simultaneously.  *See Johnson v. Carlo*

*Lizza & Sons Paving, Inc.*, 160 F. Supp. 3d 605, 617 (S.D.N.Y. 2016) (FRCP 8(d) permits a

plaintiff to simultaneously pursue contract claim and quasi-contract recovery); *Singer v. Xipto*

*Inc.*, 852 F. Supp. 2d 416, 426 (S.D.N.Y. 2012) ("While a party generally may not

simultaneously recover upon a breach of contract and unjust enrichment claim arising from the

same facts, it is still permissible to plead such claims as alternative theories"); *St. John's Univ. v.*

*Bolton,* 757 F. Supp. 2d 144, 183-84 (E.D.N.Y. 2010) ("At the pleading stage, Plaintiff is not

required to guess whether it will be successful on its contract, tort, or quasi-contract claims.").

## VI. PLAINTIFFS STATED A CLAIM FOR BREACH OF THE BUYOUT AGREEMENT

Defendants last argue that Plaintiffs failed to state a claim for breach of the Buyout

Agreement.  (Motion Arg. VI).  That argument too is meritless, as a review of Plaintiffs' factual

allegations in the Complaint, all of which must be assumed as true with all inferences in

Plaintiffs' favor, makes clear that multiple breaches of the Buyout Agreement were properly

pled, (Compl. ¶¶74, 96(c), 102-113, 148-164).  More particularly: (1) ¶149 of the Complaint

alleges the existence of an agreement between Suchman, Defendant and IPHU, namely the

Buyout Agreement; (2) ¶157 of the Complaint alleges that Suchman performed its obligations

under the Buyout Agreement; (3) ¶¶74, 96, 156, 157, 158, 160 and 161 of the Complaint allege

that Iconix and IPHU breached the Buyout Agreement, including without limitation by breaching

§7.4(a) (by failing to make contractually required royalty payments), §7.4(e) (by failing to

deliver contractually required royalty reports), §7.4(h) (by refusing to honor contractual audit

mechanisms), §7.4(i) (by refusing to honor contractual "Transfer Protections"); §7.4(j) (by

refusing to honor contractual "Change in Operation Protections"), §7.6 (by breaching

representations that they were not in violation, and had not been given written notice, of any

violation of law, and that there were no investigations, proceedings or reviews pending), and by

breaching the implied covenant of good faith and fair dealing (intentionally depriving Suchman and EGRHC of the consideration promised in the Buyout Agreement); and (4) ¶¶159, 162 and 163 of the Complaint allege damage to Plaintiffs resulting from such breaches.

Defendants' arguments to the contrary fail to accurately and/or comprehensively address Plaintiffs' allegations. Defendants argue that Plaintiffs failed to allege that payments were due, but ignore that such allegation necessarily was made (and satisfies notice pleading) where Plaintiffs alleged that Defendants breached their obligation to make payments under §7.4 of the Buyout Agreement. Where Defendants argue that they would have complied with the Buyout Agreement upon entry into an NDA, they just create factual disputes which cannot support their motion to dismiss. *See* Motion p.24 (asking the Court to accept facts "contrary to Plaintiffs' allegation") p.25 (arguing that Plaintiffs' allegations "are utterly meritless as a matter of fact"). Where Defendants argue that Plaintiffs failed to allege that Defendants were "given notice" of a violation of law, Defendants ignore that Plaintiffs alleged that Defendants *were* in violation (irrespective of notice), and that the SEC had begun a review of Defendants' improper accounting practices, with such allegations being more than sufficient to state a claim for breach. (Compl. ¶¶74, 91, 160). Finally, even if every one of Defendants' arguments had merit (which they do not), Defendants' motion still would fail because Defendants ignore the multitude of Plaintiffs' additional allegations, summarized above, making claims for still additional breaches beyond those few which are challenged by Defendant in the Motion.

## <u>CONCLUSION</u>

For the reasons above, Defendants' Motion should be denied in its entirety or, alternatively, Plaintiffs respectfully request opportunity to replead.

Dated:  January 15, 2018        DONNENFELD LAW PLLC

By: _____
      Gregg Donnenfeld, Esq.
37 Northern Blvd., #280
Greenvale, NY 11548
917-251-2452

Monica Hanna, Esq.
HANNA LAW LLC
814 Willow Ave., Suite 5RR
Hoboken, NJ 07030
(201) 739-9780

*Attorneys for Plaintiffs*
  *Seth Gerszberg and EGRHC, LLC*