UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                                             :
SETH GERSZBERG and EGRHC, LLC,                               :
                                                             :
                              Plaintiffs,                    :
                                                             :
                                                             :
              -v-                                            :        17-cv-8421 (KBF)
                                                             :
ICONIX BRAND GROUP, INC., IP HOLDINGS:                       :        OPINION & ORDER
UNLTD., LLC, and NEIL COLE,                                  :
                                                             :
                              Defendants.                    :
                                                             :
------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 7, 2018

KATHERINE B. FORREST, District Judge:

On November 1, 2017, plaintiffs Seth Gerszberg and EGRHC, LLC

("EGRHC") filed this lawsuit against defendants Iconix Brand Group, Inc. ("Iconix"),

IP Holdings Unlimited, LLC ("IPHU"), and Neil Cole.  (ECF No. 1, Compl.)  Based

on a series of transactions related to the licensing of a portfolio of consumer brands

(described below in more detail), plaintiffs allege that defendants are liable for:

breach of fiduciary duty and aiding and abetting (Claim I); fraudulent inducement

(Claim II); breaches of contract (Claims III and IV); and unjust enrichment (Claim

V).

Defendants have moved to dismiss the Complaint, claiming in large part that

plaintiffs released their claims against defendants when they entered into a 2013

transaction.  (ECF No. 16.)  For the reasons stated below, the motion to dismiss is

GRANTED in part and DENIED in part.

I.      BACKGROUND

Unless otherwise noted, the factual allegations below are drawn from plaintiffs' Complaint, (ECF No. 1), and presumed true for purposes of this motion.[1]

Seth Gerszberg is one of the founders of Marc Ecko Enterprises ("MEE"), a group of affiliated companies that "were all ultimately owned or controlled by or otherwise affiliated with Gerszberg." (Compl. ¶¶ 1, 24.) As of 2009, MEE included (1) intellectual property ("IP") holding companies which owned global IP rights in and to ECKO UNLTD., MARC ECKO, and ZOO YORK (collectively, the "MEE Brands"), and (2) operating companies that operated apparel and other businesses using the MEE Brands under licenses from the IP holding companies. (Id. ¶ 25.) Gerszberg also owned Suchman, LLC, which was MEE's principal unsecured lender. (Plaintiff EGRHC is wholly owned by Gerszberg and is the successor-in-interest to all of Suchman's rights in and relating to the "perpetual royalty stream" provided for in the Buyout Agreement, discussed in greater detail below. (Compl. ¶ 14.))

Iconix is a global brand management company founded by Neil Cole in 1993. (Id. ¶ 28.) It manages brands through the administration of licensing programs; in other words, it acquires ownership of brands and then licenses those brands to operating companies that design, manufacture, sell, and distribute products. In return, Iconix receives royalty payments. (Id. ¶ 31.) Neil Cole was Chief Executive

---

[1] The Court also references the contracts submitted by defendants in support of their motion; plaintiff does not object to their consideration. (See ECF No. 21, Pls.' Mem. of Law in Opp. to Defs.' Mot to Dismiss the Compl. ("Mem. Opp.") at 1 n.1.)

Officer, President, and Chairman of the Board from Iconix's founding 1993 until August 2015. (Id. ¶ 33.)

On October 30, 2009, Gerszberg and his MEE-affiliated entities sold their rights in and to the MEE Brands to a newly-formed company, IPHU. (Id. ¶ 35.) Iconix held a 51% interest in IPHU and Suchman held a 49% interest. (Id. ¶¶ 35, 37.) IPHU then granted a license back to MEE (or any other Gerszberg-affiliated entities) to allow MEE to continue operating the businesses for the MEE Brands. (Id. 36.) The material terms of the transaction are contained in the IPHU Operating Agreement (the "Operating Agreement"). (ECF No. 18-2, IP Holdings Unltd. LLC Operating Agreement ("Op. Ag.").)

To effectuate the license-back arrangement, IPHU and a newly-formed Gerszberg-affiliated entity, 3TAC, simultaneously entered into a Global License Agreement (the "MEE License Agreement"); while 3TAC was to have no actual sales operations, 3TAC was granted the exclusive rights to use or sublicense its rights to the MEE Brands to the various existing and anticipated operating entities comprising MEE in exchange for royalty payments. (Compl. ¶¶ 39-43; see also ECF No. 26-1, MEE License Agreement ("MLA").[2]) To support this business relationship, "Suchman loaned tens of millions of dollars to MEE to support MEE's operations and expenses in accordance with the MEE License Agreement." (Compl. ¶ 50.)

---

[2] While defendants did not initially submit this document to the Court, it is referred to extensively in the Complaint and therefore incorporated by reference in it. It is also incorporated by the Operating Agreement, which is also referenced throughout the Complaint, and was submitted upon the Court's request. (See ECF Nos. 25, 26.)

The MEE License Agreement was amended four times. The Fourth Amendment was signed on May 13, 2013 in conjunction with a Buyout Agreement between IPHU, Iconix, Suchman, and Gerszberg. (Id. at 70-75.) This series of transactions extended the initial license period by six months to September 30, 2015 and converted it to a non-exclusive license. (Compl. ¶ 71; see also MLA, Ex. E, Fourth Amendment to MLA.) Suchman transferred its 49% interest in IPHU to Iconix (making Iconix the sole owner of IPHU), and 3TAC agreed to pay $19 million to IPHU—$8 million for allegedly past-due royalties and $11 million for future royalties for the remaining twenty-seven months of the license term. (Id. ¶ 70-75.) In return, IPHU granted Suchman a perpetual, assignable, and non-terminable right to receive 10% of all royalty proceeds earned by IPHU and its affiliates after May 17, 2013 and after the first $75 million (including the $11 million prepaid royalties deemed paid by 3TAC on the same date) (the "Perpetual Royalty Stream").

As particularly relevant here, the Buyout Agreement contains a release of claims ("the Release") by Suchman and Gerszberg against Iconix. The Release states that the Suchman parties release Iconix and

> its shareholders, members, officers, owners, directors, . . . predecessors, successors, parents and assigns from, and covenant not to sue for, any and all Claims of whatever kind or nature in law, equity or otherwise, . . . whether now known or unknown, suspected or unsuspected, and whether or not concealed or hidden, that the Suchman Releasing Parties now own or hold, of in the past have owned or held, against any of the Iconic Released Parties.

(Buyout Ag. § 5.2.) Crucially, the release is from claims

> relating to or arising from the Operating Agreement (including without limitation to Iconix's performance and/or non-performance of its

4

obligations with respect to IPHU) and/or to the extent relating to or arising from IPHU's business, operations, assets, liabilities and/or Contracts (including without limitation any Third party License Agreements, but excluding the MEE License Agreement) to which IPHU at any time was and/or is a party, from the beginning of time through and including the date of this Agreement.

(Id.)  Additionally, the Agreement provides that it "may be pleaded as a full and complete defense to . . . any claim, action, proceeding, or suit that is commenced, instituted, or prosecuted . . . ."  (Id.)

Also relevant is § 4.6 of the Buyout Agreement, which states that

[n]one of the Iconix Parties is in violation of, and has not been given written notice of any violation of, any law, statute order, rule, regulation . . . of any Governmental Authority. . . .  No investigation, proceeding or review relating to the Iconix Parties by any Governmental Authority is pending or threatened, other than such investigations, proceedings or reviews that could not reasonably be expected to have a Material Adverse Effect.

(Buyout Ag. § 4.6.)

Plaintiffs' claims to a large extent arise out of the Operating Agreement—claims under that Agreement are released by the Buyout Agreement.  On a more granular level, they argue that they entered into the 2013 series of transactions based on defendants'—allegedly knowingly false—representations that they were developing a "modified business plan with a replacement master licensee."  (Id. ¶ 95.)  Their lawsuit also alleges that defendants "actively sabotaged" 3TAC's and MEE's business and conducted improper accounting practices and refused to, inter alia, make any Perpetual Royalty Stream payments, eventually causing the MEE companies to declare bankruptcy.  (Id. ¶ 97-101.)

II.   LEGAL PRINCIPLES

A.  Pleading Standard

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must provide grounds upon which their claim rests through "factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, the complaint must allege "'enough facts to state a claim to relief that is plausible on its face.'" Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In applying that standard, the Court accepts as true all well-pled factual allegations, but it does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." Id. Furthermore, the Court will give "no effect to legal conclusions couched as factual allegations." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). If the Court can infer no more than the mere possibility of misconduct from the factual averments—in other words, if the well-pled allegations of the

complaint have not "nudged [plaintiff's] claims across the line from conceivable to plausible"—dismissal is appropriate. <u>Twombly</u>, 550 U.S. at 570.

B. <u>Contractual Releases</u>

"The interpretation of releases is governed by principles of contract law." <u>Bank of Am. Nat'l Tr. & Sav. Ass'n v. Gillaizeau</u>, 766 F.2d 709, 715 (2d Cir. 1985) (citing <u>Gordon v. Vincent Youmans, Inc.</u>, 358 F.2d 261, 263 (2d Cir. 1965)). "Generally, 'a valid release constitutes a complete bar to an action on a claim which is the subject of the release.'" <u>Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.</u> ("<u>Centro Empresarial II</u>"), 952 N.E.2d 995, 1000 (N.Y. 2011) (quoting <u>Global Mins. & Metals Corp. v Holme</u>, 35 A.D.3d 93, 98 (N.Y. App. Div. 2006)). In addition, "a claim for fraud within the scope of a release can be released even if it is unknown to the releasor, and notwithstanding that the releasee did not make full disclosure of its wrongdoing before the release was granted." <u>Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.</u> ("<u>Centro Empresarial I</u>"), 76 A.D.3d 310, 318 (2010), aff'd, 17 N.Y.3d 269, 952 N.E.2d 995 (2011). "[A] 'general release executed even without knowledge of a specific fraud effectively bars a claim or defense based on that fraud.'" <u>Id.</u> at 318 (quoting <u>Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.</u>, 544 F. Supp. 2d 178, 190-192 (S.D.N.Y. 2008)).

"Although a defendant has the initial burden of establishing that it has been released from any claims, a signed release 'shifts the burden of going forward . . . to the [plaintiff] to show that there has been fraud, duress or some other fact which will be sufficient to void the release.'" <u>Centro Empresarial II</u>, 952 N.E.2d at 1000

(quoting <u>Fleming v. Ponziani</u>, 247 N.E.2d 114 (N.Y. 1969)). "A plaintiff seeking to invalidate a release due to fraudulent inducement must 'establish the basic elements of fraud, namely a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury.'" <u>Id.</u> at 1000 (quoting <u>Global Mins. & Metals Corp. v. Holme</u>, 35 A.D.3d 93, 98 (N.Y App. Div. 2006)).

"A sophisticated principal is able to release its fiduciary from claims . . . so long as the principal understands that the fiduciary is acting in its own interest and the release is knowingly entered into." <u>Centro Empresarial II</u>, 952 N.E.2d at 1001. The New York Court of Appeals has held that "large corporations engaged in complex transactions in which they were advised by counsel" and for which they "negotiated and executed an extraordinarily broad release with their eyes wide open" qualify as "sophisticated principals" and thus cannot later "invalidate that release by claiming ignorance of the depth of their fiduciary's misconduct." <u>Id.</u> at 1001-02.

"Notably, a release may encompass unknown claims, including unknown fraud claims, if the parties so intend and the agreement is fairly and knowingly made." <u>Id.</u> at 1000 (internal quotations omitted). "[A] party that releases a fraud claim may later challenge that release as fraudulently induced only if it can identify a separate fraud from the subject of the release." <u>Id.</u> at 1000 (internal quotations omitted).

C.  Fraudulent Inducement

A claim of fraudulent inducement under New York law requires plaintiffs to allege: "'(1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury." Eaves v. Designs for Fin., Inc., 785 F. Supp. 2d 229, 246 (S.D.N.Y. 2011) (quoting Computerized Radiological Servs. v. Syntex Corp., 786 F.2d 72, 76 (2d Cir. 1986)).  A plaintiff asserting fraudulent inducement must also satisfy the "heightened pleading standards of Federal Rule of Civil Procedure 9(b), which provides that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" Id. at 246-47 (quoting Fed. R. Civ. P. 9(b)).

Additionally, in New York, "a promissory statement of what will be done in the future . . . gives rise only to a breach of contract cause of action," whereas "a misrepresentation of a present fact . . . gives rise to a separate cause of action for fraudulent inducement." Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 184 (2d Cir. 2007).  In other words, a promise about anticipated future performance often does not give rise to a fraudulent inducement claim in New York.

D.  Unjust Enrichment

To state a claim for unjust enrichment under New York law, a plaintiff must allege that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and

good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004) (citing Clark v. Daby, 751 N.Y.S.2d 622, 623 (N.Y. App. Div. 2002)).

Generally, "a claim for unjust enrichment may be pleaded in the alternative to other claims." Barnet v. Drawbridge Special Opportunities Fund LP, No. 14-cv-1376, 2014 WL 4393320, at *22 (S.D.N.Y. Sept. 5, 2014) (citations omitted); see also Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.  If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."); Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.")

However, unjust enrichment "is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Corsello v. Verizon, Inc., 18 N.Y.3d 777, 790 (2012) (citations omitted); see also Mahoney v. Endo Health Solutions, Inc., No. 15-cv-9841, 2016 WL 3951185, at *11 (S.D.N.Y. July 20, 2016).  If a "valid and enforceable" contract governs the dispute, a party may not recover under unjust enrichment. Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield, 448 F.3d 573, 587 (2d Cir. 2006).  Rather, unjust enrichment "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." Corsello, 18 N.Y.3d at 790; see also Mahoney, 2016 WL

3951185, at *11. "Typical cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled." Corsello, 18 N.Y.3d at 790 (citations omitted); see also Mahoney, 2016 WL 3951185, at *11.

E. Breach of Contract

To succeed on a claim for breach of contract, a plaintiff must demonstrate "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co., 375 F.3d 168, 177 (2d Cir. 2004) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)).

III. DISCUSSION

A. Plaintiffs' Claims

As discussed below, the Buyout Agreement plainly releases a number of plaintiffs' claims—specifically, those which do not arise from or relate to the MEE Licensing Agreement. Accordingly, the Court here lays out which of plaintiffs' claims arise from or relate to specific agreements:

1. Claim I arises from the Operating Agreement.

2. Claim II arises from the Operating Agreement and the Fourth Amendment to the MEE Licensing Agreement.

3. Claim III arises from the Buyout Agreement.

4. Claim IV arises from the Operating Agreement.

5. Claim V relates to the MEE Licensing Agreement and the Buyout Agreement.

11

B. <u>Released Claims (Claims I and IV in Full, and Claim II in Part)</u>

The Buyout Agreement released all of plaintiffs' claims that existed as of May 13, 2013 and which arose from the Operating Agreement or IPHU's business, operations, assets, liabilities and/or contracts, <u>except for</u> the MEE License Agreement.  As such, Claims I and IV are dismissed in full, and Claim II is dismissed to the extent it arises from the Operating Agreement.

The Buyout Agreement's broad language (repeated above) expresses the parties' clear intent to release each other from any and all claims of whatever kind that existed as of May 13, 2013, whether or not they were known at the time of signing, <u>except for</u> those arising from or relating to the MEE License Agreement.  The fiduciary duty that is the subject of Claim I arises solely from the Operating Agreement—plaintiffs cannot now bring a claim for breach of that duty when it was expressly released.  For the same reason, plaintiffs' claim for breach of the Operating Agreement (Claim IV) was released by the Buyout Agreement, as was any claim for fraudulent inducement of the Buyout Agreement (Claim II in part).

Plaintiffs counter that their claims are carved out from the release by virtue of the exception for the MEE License Agreement.  According to this argument, because all of plaintiffs' claims—and indeed the parties' entire relationship—relate to the MEE License Agreement, none could have been released.  But if this were correct, the release would have no effect in practice, and surely that was not the parties' intent.  The parties unambiguously intended a set of claims to have been released at the time of signing.

The reason for IPHU's existence was to give effect to the license-back arrangement between the MEE and Iconix parties. It is an agreement that stands alone—with independent rights and obligation between the parties. A release of claims relating to the operations of <u>IPHU</u> stands separately from a release of specific claims relating to the MEE License Agreement. By virtue of signing the Buyout Agreement, the parties believed they were releasing claims relating or arising from the Operating Agreement or IPHU's business and operations. Any reading of the release therefore indicates that the carve-out from the release preserves a narrower set of claims: only those relating to the terms of the MEE License Agreement. Claims I and IV arise directly from the Operating Agreement, not the MEE License Agreement, as does part of Claim II. Accordingly, those claims were released and cannot survive defendants' motion to dismiss.

Plaintiffs also claim that the Buyout Agreement was fraudulently induced (Claim II), and therefore the release is invalid.[3] But plaintiffs have neither alleged that Suchman and/or Gerszberg were unsophisticated actors nor sufficiently pled that the fraud upon which they relied in signing the Buyout Agreement was a separate fraud from the subject of that Agreement. Claims of fraudulent inducement regarding the alleged concealment of illegal activities prior to the signing of the Buyout Agreement were expressly released, as the release

---

[3] In essence, if Claim II for fraudulent inducement of the Buyout Agreement were to survive the motion to dismiss, then the Court would be unable to dismiss Claims I and IV, as plaintiffs would have adequately stated a claim that the release was fraudulently induced. However, plaintiffs have failed to do so.

13

encompasses "all claims . . . whether now known or unknown, suspected or unsuspected, and whether or not concealed or hidden."  (Buyout Agreement § 5.2.)

However, insofar as Claim II alleges fraudulent inducement of the MEE License Agreement, plaintiffs' claim survives.[4]  While representations about future plans cannot be grounds for a fraudulent inducement claim, see Merrill Lynch, 500 F.3d at 184; see also Centro Empresarial I, 76 A.D.3d at 320 (2010) ("[I]f plaintiffs did not wish to forego suing on a fraud claim they might discover in the future, these sophisticated and well-counseled entities should have insisted that the release be conditioned on the truth of the financial information provided by defendants (whether directly or through public filings) on which plaintiffs were relying."), plaintiffs have sufficiently alleged that defendants misrepresented facts known at the time of signing.

For these reasons, Claims I and IV are dismissed, as are those aspects of Claim II which arise out of the Operating Agreement.  The claims cannot be revived through an invalidation of the release for fraudulent inducement of the Operating Agreement.

C. Fraudulent Inducement of the Fourth Amendment to the MEE License (Claim II)

While plaintiffs have not stated a claim for fraudulent inducement of the Buyout Agreement, Claim II does survive the motion to dismiss insofar as it raises a claim as to fraudulent inducement of the Fourth Amendment to the MEE License

---

[4] This allegation is addressed more fully in the following section.

(the "Fourth Amendment").  Defendants assert that this claim is barred by the
release in the Buyout Agreement, but as discussed above, the release does not cover
claims that relate to the terms of the MEE License Agreement.

Defendants also argue that plaintiffs failed to adequately plead a claim under
Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.  The Complaint
alleges that defendants made affirmative representations to plaintiffs regarding,
inter alia, the "value and status of the MEE licensing business," such as the
statement that Cole "had a replacement licensee to begin serving as master licensee
of the MEE brands."  (Compl. ¶ 142.)  Plaintiffs specifically state that defendants
knew that this representation and others were false and Suchman and Gerszberg
signed the Fourth Amendment in reliance on them.  They also allege justifiable
reliance; for example, they state that "it would make no economic sense to
terminate the master licensee, which had been responsible for $20 million a year in
revenues, without having a replacement licensee ready to take over."  (Id.)  Finally,
plaintiffs allege several injuries, including 3TAC's agreement to a $19 million
payment for the Fourth Amendment.  (Id. ¶ 71.)  At this stage, plaintiffs have
alleged enough to survive a motion to dismiss; accordingly the motion is DENIED as
to the aspects of Claim II which arise from the MEE License Agreement.

D.  Breach of Contract (Claim III)

Claim III of the Complaint alleges breach of contract with regard to the
Buyout Agreement.  Specifically, plaintiffs allege that defendants (1) breached
contractual obligations with regards to the perpetual royalty stream, and (2)

breached section 4.6 of the Buyout Agreement, which provides a warranty that defendants were not in violation of any laws and that they did not know of any ongoing governmental investigations.

As to the first category of assertions, plaintiffs argue that defendants breached the Buyout Agreement by failing to perform "their obligations related to the Perpetual Royalty stream." (Compl. ¶ 156.) They allege that (1) no payments were made to Suchman or EGRHC; (2) no information regarding the Perpetual Royalty Stream, IPHU's sales, transfers, or other dispositions of its Covered IP Rights, or changes in IPHU's business model was ever disclosed; and (3) Iconix and IPHU imposed "additional unwarranted conditions not authorized in the Buyout Agreement" before allowing EGRHC to conduct an audit of IPHU's books with respect to the Perpetual Royalty Steam. (Compl. ¶ 156.)

But there was a condition precedent to the royalty stream payments—according to the Buyout Agreement, the payments to Suchman were only due once IPHU had earned $75 million of royalty proceeds. (Buyout Ag. § 7.4.) While the parties agree that IPHU earned at least $11 million from 3TAC as a result of their agreement, plaintiffs do not allege that an additional $64 million was ever earned by IPHU. As such, plaintiffs have not sufficiently alleged that any payments were contractually required at any time and thus have not stated a claim for breach of contract in this regard.

As to plaintiffs' various claims regarding defendants' lack of information disclosure and IPHU's failure to allow EGRHC to conduct an audit without

"unwarranted conditions," plaintiffs provide no detail as to what those conditions were in their Complaint or their opposition to this motion. Defendants assert that the requested condition was a non-disclosure agreement ("NDA"), which was allowed by § 8.4 of the Buyout Agreement. (Mem. Opp. at 24.) Specifically, § 8.4 permits the parties to request the execution of documents when reasonably required to effectuate the terms in the Buyout Agreement. Plaintiffs do not allege that defendants' request for an NDA (or any specific condition, for that matter) was unreasonable and therefore not permitted by the contract. As such, plaintiffs' threadbare accusations of "unwarranted" conditions cannot support a claim for breach of contract.

However, the Complaint does support a claim that defendants breached § 4.6 of the Buyout Agreement, which represents that as of May 13, 2013, defendants were not in violation of, and had not been given written notice of any violation of, any laws and that no investigation was pending or threatened. (Buyout Ag. § 4.6.) Plaintiffs allege that "apparently Iconix had been acting in violation of U.S. securities laws by engaging in improper accounting practices and issuing false and misleading financial statements; and an SEC review of Iconix's improper accounting practice was already pending and was likely to become a full-scale investigation." (Compl. ¶ 161.)

Specifically, the Complaint asserts that defendants "knowingly designed and implemented flawed and deceptive accounting methodologies in a manner out of accordance with GAAP, such as inconsistent treatment of revenues under cash

versus accrual bases . . . ." (Id. ¶ 57m.)  It also alleges that defendants "fraudulently inflate[d] publicly disclosed earnings" by structuring Iconix's business dealings to "secretly 'round-trip' funds from Iconix or one of its affiliates to a third party and then back to Iconix, under the guise of legitimate revenue."  (Id. ¶ 84.) They provide specific examples of this practice, such as an investment of "tens of millions of dollars into an otherwise insolvent operating company solely for purposes of funneling that money back to Iconix in the form of pretextual royalty payments which otherwise would not have been booked or earned," and the positioning of a manufacturing company "doing business as 'New Rise'" as "a licensee with guaranteed minimum commitments owed to Iconix and/or IPHU notwithstanding that Defendants knew that New Rise was an effectively insolvent company almost sure to fail, thereby providing Defendants with a pretextual basis for avoiding a publicly disclosed write-down of overinflated assets."  (Id.)  Plaintiffs also allege that a "number of Iconix accounting improprieties were reported in lawsuits filed by Iconix shareholders alleging securities fraud by Cole, Iconix, and other Iconix officers."  (Id. ¶ 85.)  These alleged lawsuits alleged, <u>inter alia</u>, false and/or misleading statements.  (Id.)  Furthermore, plaintiffs claim that the SEC began questioning Iconix's accounting practices in comment letters in 2013, though they do not indicate whether this began before or after the Buyout Agreement was signed.  (Id. ¶ 86.)

At the motion to dismiss phase, this is enough to state a claim that § 4.6 of the Buyout Agreement was breached, as plaintiffs sufficiently allege that

defendants were in violation of the law at the time of signing. Accordingly, the motion to dismiss Count III is DENIED as to that section of the Buyout Agreement, and GRANTED as to all other allegations of breach of contract.

E. Unjust Enrichment (Claim V)

The parties' relationship was governed by a number of contracts, as discussed in detail above. Accordingly, plaintiffs' unjust enrichment claim (Claim V) must be dismissed. The conduct challenged in the Complaint is governed by the Buyout Agreement and the MEE License Agreement; unjust enrichment "is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Corsello, 18 N.Y.3d at 790. "[W]here the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded." IDT Corp. v. Morgan Stanley Dean Witter & Co., 907 N.E.2d 268, 274 (N.Y. 2009) (emphasis added). Here, a "valid and enforceable" contract governs the dispute, so plaintiffs may not recover under unjust enrichment. Beth Israel Med. Ctr., 448 F.3d at 587.

While plaintiffs assert that Claim V is predicated on conduct not covered by the contracts, they have not persuaded the Court that the conduct underlying the claim is alleged to be separate and apart from the contracts. Rather, the conduct is the same subject matter covered by the contracts—namely, Iconix's acquisition of IPHU and the full value of the legacy receivables, as well as, generally, "their multi-year course of misconduct targeting the MEE License Agreement and the MEE

19

Brands businesses and their fraudulently inducing Suchman to give up its entire 49% interest in IPHU . . . in exchange for promised consideration . . . ." (Compl. ¶¶ 174, 177.) This is certainly the same subject matter covered by the contracts; thus, plaintiffs cannot base a claim for unjust enrichment on this conduct, even in the alternative.

Plaintiffs also seek to avoid this result by arguing that Cole is not a party to any of the agreements, but they do not allege that Cole personally received any direct benefit. As such, plaintiffs have not stated a claim for unjust enrichment as to him. <u>Briarpatch Ltd.</u>, 373 F.3d at 306.

Accordingly, Claim V is DISMISSED.

IV.     CONCLUSION

For the foregoing reasons, Claims I, IV, and V are DISMISSED in full. Claim II as it relates to the Operating Agreement and Claim III as it relates to the Perpetual Royalty Stream payments and information sharing are also DISMISSED. The motion to dismiss is DENIED as to Claim II as it relates to the MEE License Agreement and Claim III as it relates to breach of Section 4.6 of the Buyout Agreement.

The Clerk of Court is directed to close the motion at ECF No. 16.  A separate scheduling order shall issue.

SO ORDERED.

Dated:        New York, New York
              May 7, 2018

                                        _____
                                        KATHERINE B. FORREST
                                        United States District Judge